UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RAYMOND DUPUIS, as Personal Representative of the Estate of Adam Dupuis,<br><br>        Plaintiff,<br><br>  v.<br><br>MARTIN MAGNUSSON, et al.,<br><br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 04-10-B-H<br>)<br>)<br>)<br>) |

**RECOMMENDED DECISION ON JOSEPH FITZPATRICK'S
MOTION TO DIMISS AND FOR SUMMARY JUDGMENT
(Docket No. 97)**

Raymond Dupuis brought this civil action seeking redress from multiple defendants associated with the Maine State Prison after his son, Adam Dupuis, committed suicide at the prison. Dupuis's complaint contains two counts asserting that the defendants subjected his son to cruel and unusual punishment in contravention of his constitutional right.[1] Joseph Fitzpatrick has filed a dispositive motion seeking dismissal or, in the alternative, summary judgment. I recommend that the court grant Fitzpatrick summary judgment.

*DISCUSSION*

*Summary Judgment Standard*

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a

---

[1] The complaint also includes one count of wrongful death and one count asserting a right to a jury trial. There is no dispute that Dupuis has not brought any state action for professional negligence against defendant Fitzpatrick. (SMF ¶ 16; Resp. SMF 16.) The wrongful death count seems to be a damages place-holder.

'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)).  Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.

*Deliberate Indifference Standard*

In Manarite By and Through Manarite v. City of Springfield, the First Circuit described the Eighth Amendment deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally or with an analogous state of mind usually described as "deliberate indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case);  Estelle v. Gamble, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
> The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. Canton, 489 U.S. at 388 n. 7  ("some [lower] courts have held that a showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ... 'deliberate indifference'" ); Daniels v. Williams, 474 U.S. 327, 328 (1986) (civil rights laws do not permit recovery based on simple negligence).

> Although some courts have used language suggesting that the deliberate indifference standard includes simple negligence- see, e.g., Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir.1991) (defendant "reasonably should have known" of detainee's suicidal tendencies)-in their application of the deliberate indifference standard, courts have consistently applied a significantly stricter standard. In DeRosiers v. Moran, 949 F.2d 15 (1st Cir.1991), for example, this court stated that deliberate indifference requires
>> the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain ... While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge [or willful blindness] of impending harm, easily preventable.
>
> Id. at 19 (citations omitted); Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir.1990) (standard of "'reckless' or 'callous' indifference" for supervisors' liability), cert. denied, 500 U.S. 956 (1991); Walker v. Norris, 917 F.2d 1449, 1455-56 (6th Cir.1990) ("deliberate indifference" standard in supervisory liability case); Berry v. Muskogee, 900 F.2d 1489, 1496 (10th Cir.1990) (same); Sample v. Diecks, 885 F.2d 1099, 1117-18 (3d Cir.1989) (same).
>
> The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); accord Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992); see also Farmer v. Brennan, 511 U.S. 825 (1994).

*Material Facts*

There is no dispute as to the following.  Joseph Fitzpatrick is a licensed clinical psychologist with a Ph.D. in psychology. He is not a psychiatrist or other type of medical professional and has no expertise in matters of medication. (SMF ¶ 1; Resp. SMF ¶ 1.)   He has been employed as the Director of Treatment Programming by the Maine Department of Corrections since spring of 2001.  (SMF ¶ 2; Resp. SMF ¶ 2.)  In his position as the Department's Director of Treatment Programming, defendant Fitzpatrick's responsibilities have

3

primarily consisted of providing general supervision and consultation to the Department's mental health treatment staff and providing advice to the Commissioner's Office about mental health treatment programs in general. (SMF ¶ 3.) He has never had any responsibilities with respect to the provision of medical services, including the prescription of medication, and has never provided supervision to medically trained staff. (SMF ¶ 4; Resp. SMF ¶ 4.) He has never had any responsibilities with respect to security issues and has never provided supervision to guards or other security staff. (SMF ¶ 5; Resp. SMF ¶ 5.)

According to Fitzpatrick, at the time of Adam Dupuis's most recent stay in the Department's Mental Health Stabilization Unit, defendant Fitzpatrick did not provide psychotherapy to or otherwise counsel prisoners, was not a member of any prisoner's treatment team, and did not make decisions about the treatment or supervision to be provided to any individual prisoner. (SMF ¶ 6; Fitzpatrick Aff. ¶ 6.) Dupuis qualifies that Fitzpatrick did have responsibility for providing general supervision and consultation to the Department's mental health treatment staff. (Resp. SMF ¶ 6; Fitzpatrick Aff. ¶ 3.)

There is no dispute that, at the time in question, Fitzpatrick worked out of the Department's Central Office in Augusta. (SMF ¶ 7; Resp. SMF ¶ 7.) Fitzpatrick's first knowledge of Adam Dupuis came when he was contacted by Rebekah Smith and Brian Wallace (working for the Maine Civil Liberties Union and the Maine Equal Justice Partners) and was told by them that Dr. Corona, the psychiatrist, had taken Adam Dupuis off Xanax and put him on an alternative medication regimen and that Adam wanted to be put back on Xanax. (SMF ¶ 8; Resp. SMF ¶ 8.) Although neither Smith nor Wallace are medical (or mental health) professionals, they expressed their concerns that Xanax might be the medication Adam Dupuis needed for his mental illness, rather than the alternative medication prescribed by Dr. Corona.

4

(SMF ¶ 9; Resp. SMF ¶ 9.) Defendant Fitzpatrick relayed all this to Dr. Zubrod, the psychologist at the Maine State Prison's Mental Health Unit, who he understood would relay it, in turn, to Dr. Corona. (SMF ¶ 10; Resp. SMF ¶ 10.)

According to the Fitzpatrick he was subsequently told that Dr. Corona was aware of the issues and that he felt that the alternative medication regimen was more appropriate for Adam Dupuis. (SMF ¶ 11;Fitzpatrick Aff. ¶ 9.)[2] Fitzpatrick represents that he had no reason to believe otherwise. (SMF ¶ 12; Fitzpatrick Aff. ¶ 9.) Dupuis responds that Adam indicated on multiple occasions that the medical regime was not working. (Resp. SMF ¶ 12; Aff. ¶ 7.) He reiterates that Fitzpatrick was told that the switch in medications was causing Adam to suffer serious mental health issues. (Resp. SMF ¶ 12; Fitzpatrick Aff. ¶¶ 7,8.) Fitzpatrick indicates that he passed the information he received back to Rebekah Smith and Brian Wallace. (SMF ¶ 13; Fitzpatrick Aff. ¶ 10.)[3]

According to Fitzpatrick he never had any reason to believe that either the treatment or supervision provided to Adam Dupuis while he was in the Prison's Mental Health Unit was not appropriate. (SMF ¶ 14; Fitzpatrick Aff. ¶ 11.) Dupuis responds that as the Director of Treatment Programming by the Maine Department of Corrections, Fitzpatrick should have been aware the Department's mental health unit had increased in population, size, and diversity of patient needs and that there were conflicting unrealistic expectations being imposed on clinical

---

[2] The plaintiff responds by asserting that this is a hearsay statement that would be inadmissible at trial. (Resp. SMF ¶ 11.) I conclude the statement is offered as evidence of Fitzpatrick's knowledge of Dupuis's ongoing treatment program and not for the truth of Dr. Corona's assertions.

[3] The plaintiff, denying this statement, complains that it is unclear what information was passed on. (Resp. SMF ¶ 13.)

staff, at the same time that resources were being reduced and program needs compromised. (Resp. SMF ¶ 14; SAMF ¶ 19.)

There is no dispute that Fitzpatrick was not at the Maine State Prison the day that Adam Dupuis committed suicide. (SMF ¶ 15; Resp. SMF ¶ 15.)

This is the shake-out of facts after addressing Fitzpatrick's statement of material facts and Dupuis's statements in response, thereto. However, Dupuis has also filed a statement of additional facts that – in response to Fitzpatrick's motion -- numbers 201 paragraphs and spans 20 pages. (Docket No. 122-2.)[4]

The portions of Dupuis's additional statement of fact which pertain to Fitzpatrick are as follows. In the fall of 2001, in conjunction with the Maine Civil Liberties Union and the Maine Equal Justice Partners - through Rebekah Smith, Esq. - undertook the representation of prisoners after the MCLU had received a variety of complaints from prisoners regarding mental health treatment. (SAMF ¶ 162; Smith Dep. at 7- 8; Reply SAMF ¶ 162.) Smith began representing Mr. Adam Dupuis in December of 2001. (SAMF ¶ 163; Reply SAMF ¶ 163.) Smith's chief contact person in discussing mental health management of prisoners was Joe Fitzpatrick of the Department of Corrections. (SAMF ¶ 164; Reply SAMF ¶ 164.) Smith described Joe Fitzpatrick as her contact person in the Department concerning Adam. (SAMF ¶ 165; Smith Dep. At 15; Reply SAMF ¶ 165.) On January 3, 2002 Adam wrote Smith a letter stating that Dr. Corona had decided a week or two previously to wean him off his anti-anxiety medication, Xanax and Smith

---

[4] There are nine dispositive motions pending in this case and this statement is pretty much the same with respect to all the defendants' dispositive motions, although some of the other additional statements have a few further paragraphs. I held a conference of counsel – after a motion to strike was filed on un-timeliness grounds -- and heard defendants' objections to this wholesale approach taken by Dupuis. (See Docket No. 127.) In the case of Fitzpatrick's dispositive motion, the question of the tenability of much this additional statement of fact in view of the problematic supporting affidavit of Mark Holbrook does not loom as large as it does with regards to the dispositive motions of Defendants Zubrod, Dowling, Corona, and Prison Health Services Incorporated. This is because the facts pertinent to Fitzpatrick's liability are supported by citation to record evidence other than the Holbrook affidavit.

expressly discussed this concern with Joe Fitzpatrick. (SAMF ¶¶ 166, 167; Reply SAMF ¶¶ 166, 167.)

According to Dupuis, on January 11, 2002, Adam Dupuis wrote to Smith stating that Dr. Corona was still refusing to help him with Xanax. Adam Dupuis told Dr. Corona that if he went off this medication he would get into trouble and do more time. Dr. Corona responded that he would just have to do more time then. (SAMF ¶ 178; Smith Aff. ¶3.)[5] On January 18, 2002, Smith e-mailed Fitzpatrick indicating that Dr. Corona had discontinued Adam's Xanax. Smith asked Fitzpatrick about current prescriptions and a treatment plan. (SAMF ¶ 179; Smith Aff. 4.)

On January 24, 2002, Fitzpatrick responded to Smith indicating that he would look into it and, in response, Joe Fitzpatrick reported to Smith that Adam had a significant history of drug abuse and they wanted to wean him off of Xanax and try something different, even though Adam was complaining that he needed Xanax. (SAMF ¶ 180; Smith Aff. ¶5.) Fitzpatrick adds that the "they" referred to is Dr. Corona, as the other defendants had no part in that decision. (Reply SAMF ¶ 180; Dowling Aff. ¶ 6; Aff. ¶ 6.) Fitzpatrick indicated that Adam was on a hunger strike in protest to the medication change. On February 11, 2002, Raymond Dupuis faxed Smith a letter indicating that Adam was now completely off Xanax and was not feeling good. Adam was taking Paxil and Nortriptyline which were not helping his anxiety. Now he was not going to recreation or chow hall because the anxiety was so overwhelming. He felt he was a totally

---

[5] Fitzpatrick, in addition to noting that the defendant cited to the wrong paragraph of the Smith affidavit, argues that the statement should be stricken because this letter to Smith has not been properly submitted as part of the summary judgment record. (Reply SAMF ¶ 178.) I agree with Fitzpatrick that the proper approach would have been to submit the properly authenticated letter with the affidavit, but I have nevertheless credited the statement for purposes of this recommended decision.

different person and he couldn't be around people and asked Smith to get a second opinion about the medication or call his father. (SAMF ¶ 181; Smith Aff. ¶ 6.) [6]

On February 11, 2002, Smith called Fitzpatrick and left a message, called Carol Carruthers a mental health professional, and called Mary Lou Finneran, another health care professional to determine whether or not the medication substitution was appropriate. (SAMF ¶ 182; Smith Aff. 7; Reply SAMF ¶ 182.) On February 21, 2002, Smith left a message for Fitzpatrick again. In response Fitzpatrick indicated that Adam was fixated on getting his benzodiazepines and was frustrated with the alternative antidepressants. (SAMF ¶ 183; Smith Aff. ¶ 8; Reply SAMF ¶ 183.) Fitzpatrick said that none of the medical staff had seen any symptoms of anxiety attacks. On February 27, 2002, Smith met with prisoners at the Maine State Prison. Smith's work partner, Brian Wallace, of the MCLU, met with Adam and indicated that Adam felt as though there was nothing that could be done for him at that point. (SAMF ¶ 184; Smith Aff. ¶ 9.)[7]

On March 11, 2002, Smith called Fitzpatrick again but did not hear back from him. (SAMF ¶ 185; Smith Aff. ¶10; Reply SAMF ¶ 185.) On March 21, 2002 Smith called Joe Fitzpatrick again but did not hear back from him. (SAMF ¶ 186; Smith Aff. ¶11; Reply SAMF ¶ 186.)

---

[6] Fitzpatrick, in addition to noting that the defendant cited to the wrong paragraph of the Smith affidavit, argues that the statement should be stricken because this letter to Smith has not been properly submitted as part of the summary judgment record. (Reply SAMF ¶ 181.) See my comment above in footnote 4.

[7] Fitzpatrick objects to the part of this statement that relays what Wallace told Smith on hearsay grounds. (Reply SAMF ¶ 184.) Sustaining the hearsay objection would not change the outcome of this recommended decision and I have included what Wallace told Smith in my recitation of facts.

*Why Fitzpatrick is entitled to summary judgment*

The only theory of liability apropos Fitzpatrick that this record supports is liability as a supervisor; there is no dispute that he did not actually participate in Adam's treatment or cell-placement decisions. Fitzpatrick can be held liable as a supervisor "for the constitutional misconduct of [his subordinates] only on the basis of an 'affirmative link' between [his] acts and those of the offending employee." Gaudreault v. Municipality of Salem, 923 F.2d 203, 209 (1st Cir. 1990) (quoting Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir. 1985)). That is he "can be held liable only on the basis of [his] own acts or omissions, amounting at the least to 'reckless' or 'callous' indifference to the constitutional rights of others." Id. (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir.1989)).

In the facts set forth above, Dupuis does maintain that Fitzpatrick did have responsibility for providing general supervision and consultation to the Department's mental health treatment staff and as Director of Treatment Programming by the Maine Department of Corrections. He also argues that Fitzpatrick should have been aware the Department's mental health unit had increased in population, size, and diversity of patient needs and that there were conflicting unrealistic expectations being imposed on clinical staff, at the same time that resources were being reduced and program needs compromised. These are conclusory assertions of Fitzpatrick's supervisory responsibilities that are not sufficient to defeat Fitzpatrick's summary judgment showing.[8]

Otherwise, in terms of his involvements with Adam's case in particular, Dupuis has noted that Fitzpatrick was Smith's "chief contact person" in discussing mental health management of

---

[8] For instance, Dupuis has not attempted to generate a factual showing that the staffing and population ratios had resulted in previous inmate suicide/self-harm cases of which Fitzpatrick was aware or would have had a responsibility to be aware of.

Adam.  On January 24, 2002, Fitzpatrick responded to one of Smith's inquiries indicating that he would look into the situation and he reported back to Smith that Adam had a significant history of drug abuse and they wanted to wean him off of Xanax and try something different, even though Adam was complaining that he needed Xanax.   On February 21, 2002, Smith left a message for Fitzpatrick again. In response Fitzpatrick indicated that Adam was fixated on getting his benzodiazepines and was frustrated with the alternative antidepressants. Fitzpatrick said that none of the medical staff had seen any symptoms of anxiety attacks.   Then Fitzpatrick did not return Smith's calls after she left a message for him on two different days in March 2002.  Adam committed suicide on May 6, 2002.  There is no evidence that Fitzpatrick was ever made aware of the letters Adam wrote to his father.

     Dupuis's memorandum in opposition to Fitzpatrick's dispositive motion is also filed in opposition to Defendant Dr. Stephen Zubrod's dispositive motion.  Other than noting that Smith and Wallace tried to assist Adam "through repeated attempts to dialogue with Joseph Fitzpatrick" (Pl.'s Opp'n Mem. at 2),  the memorandum, while discussing Zubrod's conduct, does not pinpoint which facts in this record support his case for holding Fitzpatrick liable under the <u>Manarite By and Through Manarite</u>/ <u>Gaudreault</u> standards.  In his memorandum opposing Fitzpatrick's (and Defendant Zubrod's) dispositive motion Dupuis maintains that Adam was "victimized by the Defendants' collective deliberate indifference in violation of his Constitutional rights." (Pl.'s Opp'n Mem. at 3.)  This Court is required to parse the basis for each defendant's liability and cannot simply look at the situation as a whole and conclude that adding all the defendants' acts and omissions together is sufficient to hold them all liable. [9]

---

[9]     In his opposition memorandum Dupuis faults the defendants for not forwarding an argument regarding the unconstitutional policies mentioned in the complaint. (Pl.'s Opp'n Mem. at 10.) He opines: "The fact that Adam Dupuis was permitted access to the tools of his demise constitutes knowledge of a potential harm and failure to act

Dupuis has not created a genuine dispute of fact that at the time Fitzpatrick was involved in the matter in a supervisory capacity (an involvement Fitzpatrick, according to Dupuis's own statement of fact, ended no later than March 2002): "there was an unusually serious risk of harm (self-inflicted harm, in a suicide case)" to Adam; Fitzpatrick "had actual knowledge of (or, at least, willful blindness to) that elevated risk"; and he failed "to take obvious steps to address that known, serious risk." Manarite By and Through Manarite, 957 F.2d at 56.[10]

### *Conclusion*

For the reasons set forth above, I recommend that the court grant Fitzpatrick summary judgment (Docket No. 97.)

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive NOTICE memorandum shall be filed within ten (10) days after the filing of the objection.
       Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

February 22, 2008.                    /s/Margaret J. Kravchuk
                                      U.S. Magistrate Judge

---

appropriately and lawfully under the circumstances." (Id. at 10.) Dupuis does not explain how it would be possible to hold Fitzpatrick liable for the policy that permitted Adam to have access to the items he used to hang himself.

[10]     I think it is fair to say that Dupuis focuses on the month preceding Adam's suicide as the time when the real signs of an impending suicide were manifest.  (See SAMF ¶¶ 139-154.)   Dupuis presents no record evidence that Fitzpatrick had knowledge of these events.