United States District Court
District of Maine

| | | |
|---|---|---|
| RAYMOND DUPUIS, as Representative | ) | |
| of the Estate of Adam Dupuis | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-10-B-H |
| | ) | |
| MARTIN MAGNUSSON, et al., | ) | |
| | ) | |
| Defendants | ) | |

*RECOMMENDED DECISION ON MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT FILED BY HARTWELL DOWLING (Docket No. 106)*

Raymond Dupuis filed this 42 U.S.C. § 1983 seeking redress after his son, Adam Dupuis,

committed suicide at the Maine State Prison.  Dupuis alleges that the defendants were

deliberately indifferent to Adam's mental health medical needs and to the risk that his son would

commit suicide.[1]  Much of the focus of Raymond Dupuis's Eighth Amendment claim is the

decision made by Dr. Corona, a psychiatrist employed by a private contractor, to take Adam off

Xanax and place him on an alternative medication regime.

This dispositive motion is filed by Hartwell Dowling, a psychiatric social worker at the

prison during the time in question, asking the court to dismiss Dupuis's claims against him or, in

the alternative grant him summary judgment.  In his responsive memorandum Dupuis allows that

"from a pragmatic standpoint, Defendant Dowling's actions are not as egregious as those of

---

[1]      It is clear from Dupuis's memorandum in opposition to Dowling's motion that he is only pressing his claims
under 42 U.S.C. § 1983 on a theory that Dowling was deliberately indifferent to Adam's mental health needs in
violation of the Eighth Amendment of the United States Constitution.
        With respect to Dupuis's efforts to seek redress under Maine law, this federal action was stayed to allow
Dupuis to exhaust his medical malpractice screening panel process.  On November 15, 2007, the Maine Superior
Court entered an order and judgment in the favor of Defendants Stephen Zubrod, Hartwell Dowling, Prison Health
Services, Inc., and Doctor Alfonso Corona.  (See Docket No. 132-2.)

Defendants Fitzpatrick, Zubrod, Corona, Prison Health Services."  (Opp'n Mem. at 3 n.1.)  But

he still faults Dowling for exhibiting "a willful blindness to the known likelihood of self-harm

that Adam Dupuis evidenced."  (Id.)  I recommend that the court grant Dowling summary

judgment as to Dupuis's claims against him.

### *DISCUSSION*

#### *Deliberate Indifference Standard*

In Manarite v. City of Springfield, the First Circuit described the Eighth Amendment

deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for
> loss of life (or for serious physical harm) only where the defendant acts
> intentionally or with an analogous state of mind usually described as "deliberate
> indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter,
> 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment
> prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90 (1989) (same in
> Fourteenth Amendment municipal liability, police denial of medical treatment
> case); Estelle v. Gamble, 429 U.S. 97, 104-06 (1976) (same in Eighth
> Amendment prison medical treatment case).
>
> The Supreme Court has also made clear that, by "deliberate indifference,"
> it means more than ordinary negligence, and probably more than gross
> negligence. Canton, 489 U.S. at 388 n. 7  ("some [lower] courts have held that a
> showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ...
> 'deliberate indifference'" ); Daniels v. Williams, 474 U.S. 327, 328 (1986) (civil
> rights laws do not permit recovery based on simple negligence).
>
> Although some courts have used language suggesting that the deliberate
> indifference standard includes simple negligence- see, e.g., Elliott v. Cheshire
> County, 940 F.2d 7, 10-11 (1st Cir.1991) (defendant "reasonably should have
> known" of detainee's suicidal tendencies)-in their application of the deliberate
> indifference standard, courts have consistently applied a significantly stricter
> standard. In DeRosiers v. Moran, 949 F.2d 15 (1st Cir.1991), for example, this
> court stated that deliberate indifference requires
>> the complainant [to] prove that the defendants had a culpable state of mind
>> and intended wantonly to inflict pain ... While this mental state can aptly
>> be described as "recklessness," it is recklessness not in the tort-law sense
>> but in the appreciably stricter criminal-law sense, requiring actual
>> knowledge [or willful blindness] of impending harm, easily preventable.
> Id. at 19 (citations omitted); Gaudreault v. Salem, 923 F.2d 203, 209 (1st
> Cir.1990) (standard of "'reckless' or 'callous' indifference" for supervisors'

liability), cert. denied, 500 U.S. 956 (1991); Walker v. Norris, 917 F.2d 1449,
1455-56 (6th Cir.1990) ("deliberate indifference" standard in supervisory liability
case); Berry v. Muskogee, 900 F.2d 1489, 1496 (10th Cir.1990) (same); Sample
v. Diecks, 885 F.2d 1099, 1117-18 (3d Cir.1989) (same).

        The cases also indicate that, when liability for serious harm or death,
including suicide, is at issue, a plaintiff must demonstrate "deliberate
indifference" by showing (1) an unusually serious risk of harm (self-inflicted
harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful
blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to
address that known, serious risk. The risk, the knowledge, and the failure to do the
obvious, taken together, must show that the defendant is "deliberately indifferent"
to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); accord Bowen v. City of Manchester, 966 F.2d 13, 17 (1st

Cir. 1992). The United States Supreme Court's  Farmer v. Brennan, 511 U.S. 825 (1994) cited

Manarite as one of the Circuit level cases requiring a showing of recklessness, as opposed to

mere negligence.  511 U.S. at 836.   Farmer made clear that to demonstrate recklessness

sufficient to hold a defendant liable under the Eight Amendment, "the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." Id. at  837.  Thus, the Manarite test is consistent

with Farmer and continues to be useful for correctional institution suicide cases because of its

tailored analysis. See also  Pelletier v. Magnusson, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002).

### Summary Judgment Standard

        "At the summary judgment stage," the United States Supreme Court explained in Scott v.

Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed.

Rule Civ. Proc. 56(c)).  Scott reemphasized, "'[w]hen the moving party has carried its burden

under Rule 56(c), its opponent must do more than simply show that there is some metaphysical

doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248

(1986). Dupuis cannot defeat summary judgment by relying on "conclusory allegations, or rank

speculation." Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007)

(quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

### *Dupuis's Statement of Additional Material Facts and the Affidavit of Mark Holbrook, L.C.P.C.*

Dupuis has filed a responsive statement of fact providing his paragraph-by-paragraph

response to each statement forwarded by the defendants. In addition he has filed a statement of

additional facts. This statement of additional fact has 205 paragraphs. (Docket No. 119-03.)

This is the same statement of additional facts as filed in his response to Defendant Dowling's

dispositive motion (see Docket No. 118-3); with respect to Defendant Zubord's and Defendant

Fitzpatrick's dispositive motions Dupuis has submitted a statement of additional fact that has 201

paragraphs (see Docket No. 117-7).[2]

Of the 205 paragraphs of additional facts submitted by Dupuis, 161 rely on the affidavit

of Mark Holbrook, L.C.P.C. for record support. This affidavit is not signed by Holbrook,

although Dupuis's attorney does notarize the non-existent signature. Nowhere in the affidavit is

there an indication of Holbrook's education or qualification or his grounds for making the

---

[2]      Dupuis did not contest dispositive motions filed by Defendants Magnusson, Knight, and Ruggieri. I have
already issued recommended decisions on the dispositive motions filed by Defendants Magnusson, Knight,
Ruggieri, and Fitzpatrick. At the same time I issue this recommended decision I am issuing recommended decisions
on the dispositive motions filed by Stephen Zubrod and Dr. Corona/Prison Health Services, Inc.

sweeping representations of fact pertaining to Adam Dupuis and his treatment at the Maine State

Prison.  Dupuis has filed as an attachment to his response to Zubrod's and Fitzpatrick's

dispositive motions a resume of Mark Holbrook which has an exhibit sticker indicating that it

was used in a 2005 proceeding.  (Docket No. 117-6.)  There is no record evidence – such as

medical records – to support the statements made in the Holbrook affidavit.   Many of

Holbrook's affidavit statements purport to attest to a great deal of factual familiarity with Adam's

condition, his treatment at the prison, the staffing at the prison, his course of treatment (acts and

omissions), and Adam's state of mind in the time leading up to his suicide.  It seems that Dupuis

does <u>not</u> intend to rely on Holbrook at his expert witness; he includes in his statement of

additional facts paragraphs pertaining to the expert testimony of Doctor Shawn Willson.  (<u>See</u>

SAMF ¶¶ 187-198.)   Dupuis cites to a deposition by Doctor Willson in support of these

paragraphs.  I was able to locate this deposition at Docket No. 111-2.

> District of Maine Local Rule 56(f) provides:
>
> (f) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific
> Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if
> supported by record citations as required by this rule, shall be deemed admitted
> unless properly controverted. An assertion of fact set forth in a statement of
> material facts shall be followed by a citation to the specific page or paragraph of
> identified record material supporting the assertion. The court may disregard any
> statement of fact not supported by a specific citation to record material properly
> considered on summary judgment. The court shall have no independent duty to
> search or consider any part of the record not specifically referenced in the parties'
> separate statement of facts.

Dist. Me. Loc. R. 56(f).

The bottom line is that there is no way for this court to judge whether or not there is any

reason to credit the factual assertions contained in the Holbrook affidavit and the statements of

additional facts dependent on the affidavit.  This would be true even if the affidavit was signed,

although it is more troubling that these assertions are not signed and Dupuis has not attempted to rectify the problem after reviewing the defendants' responses pointing out the defect. Therefore, these statements of facts are not part of the record set forth below.

### *Approach to the hearsay objections*

The defendants make numerous hearsay objections to Dupuis's statements of fact, including statements that rely on a deponent's testimony as to what Adam Dupuis told the deponent or letters written by Adam prior to his death.   In the facts that follow I have concluded that for purposes of addressing this summary judgment record I will consider many of the statements 'admissible' under Federal Rule of Evidence 807's residual exception to the hearsay rule when, "the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Fed. R. Evid. 807.

### *Material Facts*

Defendant Hartwell Dowling is a licensed clinical social worker with a master's degree in social work. He is not a psychiatrist or other type of medical professional and has no expertise in matters of medication. (SMF ¶ 1; Resp. SMF ¶ 1.) At the time Adam Dupuis was last housed in the Maine State Prison Mental Health Stabilization Unit (MHU) starting on December 26, 2001, to his death on May 6, 2002, Dowling was employed by the Maine Department of Corrections as a Psychiatric Social Worker II, primarily in the MHU at the prison, working in the daytime Mondays to Fridays. (SMF ¶ 2; Resp. SMF ¶ 2.) Dowling was one of the mental health staff responsible for performing psychosocial assessments for prisoners referred for admission to the MHU and acting as a clinician for prisoners admitted to the unit, but he had no responsibilities

with respect to medical issues, including issues of medication and provided no supervision to medically trained staff.   (SMF ¶ 3; Resp. SMF ¶ 3.) Dowling had no responsibilities with respect to security issues, except that mental health staff did determine the status of prisoners based on a direct assessment, which, in turn, would determine how often they were watched, what items they were allowed to have, and how often they were allowed out of their cells. (SMF ¶ 4; Resp. SMF ¶ 4.)  He provided no supervision to the guards to make sure they kept the watch or otherwise, as that was the responsibility of security supervisors (sergeants, captain, etc.).  (SMF ¶ 5; Resp. SMF ¶ 5.)

Dowling was the primary clinician for Adam Dupuis during his last stay in the MHU and was a member of the treatment team for Adam and participated in the team's discussions about his mental health treatment issues. (SMF ¶ 6; Resp. SMF ¶ 6.) As Adam's clinician, Dowling provided him regular individual counseling and assistance with milieu treatment issues, such as relationships with other prisoners and staff and day-to-day living activities. (SMF ¶ 7; Resp. SMF ¶ 7.)

Dowling was aware that during this time period, Dr. Corona, the psychiatrist, had determined to take Adam off Xanax and put him on an alternative medication regimen. (SMF ¶ 8; Resp. SMF ¶ 8.)  Dowling had no part in this decision. (SMF ¶ 9; Resp. SMF ¶ 9.) Dowling was also aware that, while Adam sometimes indicated that the alternative medication regimen was helping him, as a general matter, he wanted to be put back on Xanax. (SMF ¶ 10; Resp. SMF ¶ 10.)  He brought Adam's wishes to Dr. Corona's attention on several occasions. (SMF ¶ 11; Resp. SMF ¶ 11.)  Dr. Corona stated each time that he felt that the alternative medication regimen was more appropriate for Adam. (SMF ¶ 12; Resp. SMF ¶ 12.)  Dowling had no reason to believe otherwise. (SMF ¶ 13; Resp. SMF ¶ 13.)

According to Dowling, he was not aware of any prior actual suicide attempts during Adam's incarceration with the Department of Corrections. (SMF ¶ 14; Dowling Aff. ¶ 9.)   He was aware that in 1998 Adam had cut himself (on one wrist) while at another correctional facility, but he was also aware that Adam had admitted to faking severe psychiatric symptoms in order to be moved from that facility. (SMF ¶ 15; Dowlinag Aff. ¶ 9.)[3]  According to Dowling, regardless, the length of time that had passed since his cutting to the time period of his last housing in the MHU meant that it was not predictive of the then current risk of his committing suicide. SMF ¶ 16; Dowling Aff.  ¶ 9.) Dupuis responds that a suicide attempt ten years ago is no less relevant than a suicide attempt last week. (Resp. SMF ¶ 16; Willson Dep. at 56.)

Dowling was not aware of any choking incidents involving Adam or any other active attempts by him to kill himself in the weeks before his death.  (SMF ¶ 17; Resp. SMF ¶ 17.) In fact, based on what Dowling knew in the days up to and including the time of his death, it appeared to him that the risk of Adam committing suicide was low and that he and the other mental health staff were treating him appropriately for what he reported was an upsurge in anxiety due to his upcoming release from incarceration. (SMF ¶ 18; Dowling Aff.  ¶ 11; Treatment Summary Docket No. 103-2.)[4]

---

[3]       Dupuis attempts to qualify this statement, asserting  that the Department of Correction's medical notes indicate that Adam had a long psychiatric history which included two suicide attempts, one of which occurred while he was in prison.  For this proposition he refers to his additional statement of fact Paragraph 1.  Furthermore, Dupuis insists that during the custodial suicide attempt "he lost a lot of blood" and had to be treated by an outside emergency facility, relying on Paragraph 86 of his statement of additional facts.  As explained above, these statements of material fact, supported as they are only by the unsigned affidavit of the mysterious Mark Holbrook, are not adequate support for disputing Dowling's well-supported statements.

[4]       According to Dupuis, during the week of April 22, 2002,   Dowling indicates that he had daily contact with Dupuis with sessions from five minutes to one hour in duration in order to prevent "further regression" and he describes Dupuis with a growing sense of anxiety, irritability and frustration.  (Resp. SMF ¶ 18, citing SAMF ¶ 141.)  Dowling's concerns increased during the week and on 04/26/02 he called the MHU during his time-off to check on him. (Resp. SMF ¶ 18, citing SAMF ¶ 142.)  Dowling was told that Dupuis had requested sub-acute status due to ""violent feelings"; On April 23rd Dupuis reports disrupted sleep, anxiety, and desire to isolate himself; April 26th he is described as "angry and hostile"; April 30th Dupuis reports that he is "very stressed"; May 2nd Dupuis

It is normal for a prisoner to be anxious about release, especially one with a history of anxiety like Adam. (SMF ¶ 19; Resp. SMF ¶ 19.) The latest treatment plan Adam and Dowling had agreed to was the treatment plan which Dowling then put in writing on April 10, 2002. (SMF ¶ 20; Resp. SMF ¶ 20.)  Adam had reported persistent thoughts of hurting others and occasional suicidal thoughts, but Dowling believed that Adam was at a low risk for committing suicide (and for hurting others) because he had not reported any intent or plan and had "contracted for safety," i.e., he had agreed to let staff know when he felt unsafe toward himself or others. (SMF ¶ 21; Dowling Aff. ¶ 12.)[5]  In fact, Adam complied with this "contract" on two occasions, once right after they agreed on his plan, when he reported an "urge" to hurt himself, and once just over two weeks later, on April 26, 2002, when he reported "violent feelings" after becoming angry with a nurse. (SMF ¶ 22; Dowling Aff. ¶ 13.)  Adam had also complied with earlier "safety contracts." (SMF ¶ 23;  Dowling Aff.  ¶ 13.)[6]

Between the two incidents, Dowling met with Adam and worked with him on the intervention strategies for him to use consistent with his treatment plan.  (SMF ¶ 24; Resp. SMF ¶ 24.)   During that time, Adam reported no suicidal or homicidal ideation and, although still anxious about his release, was future-oriented.   (SMF ¶ 25; Dowling Aff. ¶ 14.)  For example,

---

meets with Dr. Corona and reports "vague suicidal thoughts" and pleads for anxiolytic medication but Corona thinks he is "drug seeking"; May 2nd Mr. Dowling writes  "...I/M presents as calm and not overtly depressed. Denies current suicidal/homicidal ideation / intent."  This is the last documented contact with Dupuis until his suicide on May 5th. (Resp. SMF ¶ 18, citing SAMF ¶ ¶141, 142, 143.) These counter-assertions rely on statements of additional fact that rely on the unsigned Holbrook affidavit.  Accordingly, Dupuis has failed to place this statement in dispute

[5]       Dupuis does not admit the reasonableness of Dowling's belief.  (Resp. SMF ¶ 21.)

[6]       Dupuis opines that Adam did not comply with this contract in that he committed suicide. (Resp. SMF ¶¶ 22, 23.)

during that time, he paid for a new television to replace one he had asked to be thrown away during the first incident.  (SMF ¶ 25; Dowling Aff. ¶ 14.)[7]

During the week of April 22, 2002, Dowling had been in daily contact with Adam to work on his anxiety issues and had encouraged Adam to maintain that contact.  (SMF ¶ 27; Resp. SMF ¶ 27.)   In addition, even though it was not during his regular work hours and he was not on-call, on the evening of April 26, 2002, Dowling called into the prison to check on Adam, who had had an angry outburst at a nurse earlier in the day concerning his medication issues. (SMF ¶ 28; Resp. SMF ¶ 28.)  Specifically, he was angry because he had just found out that day that a lab test had been done earlier that week to determine whether he was obtaining medication from another prisoner. (SMF ¶ 29; Resp. SMF ¶ 29.)  Dowling had no part in the ordering of the lab test and assumed, when he was told about it, that it had been done pursuant to proper medical protocol. (SMF ¶ 30; Resp. SMF ¶ 30.)  Adam expressed distrust of Dowling when he told Adam that he believed that such a test is needed when there is a suspicion of improper obtaining of prescription medication. (SMF ¶ 31; Resp. SMF ¶ 31.)  When Adam raised the issue of being assigned another clinician, Dowling told him this could be explored further if he wished, but he never pursued this issue and continued to work with Dowling. (SMF ¶ 32; Resp. SMF ¶ 32.)   On the evening when Dowling called into the prison to check on Adam, he was told by a guard that Adam (who was on stabilization status) had requested sub-acute status due to violent feelings. (SMF ¶ 33; Resp. SMF ¶ 33.)  Dowling stated to the officer that this might be a good idea but that the guard needed to follow the protocol, which included contacting the on-call clinician. (SMF ¶ 34; Resp. SMF ¶ 34.) Dowling then contacted the on-call clinician himself to brief him

---

[7]          Dupuis complains that Paragraph 25 is too vague to understand what time period the statement is intended to cover. (Resp. SMF ¶ 25.)  I disagree. The time indicated is between shortly after April 10 and April 26.

on recent events and suggested to him that he should find out if Adam's violent feelings were directed at himself and, if so, consideration should be given to placing him on acute status. (SMF ¶ 35; Resp. SMF ¶ 35.)  Dowling also knew that Adam was scheduled to see Dr. Corona on the coming Thursday to talk about his medication issues, specifically his desire to be put back on Xanax at night. (SMF ¶ 36; Resp. SMF ¶ 36.)

Acute status was for prisoners at a high risk of suicide (or a high risk of harm to others) and involves the prisoner being placed on a constant watch by a guard and not having any items with which he could possibly hurt himself. (SMF ¶ 37; Resp. SMF ¶ 37.) The prisoner wears a safety smock, essentially a gown made out of a thick untearable material. (SMF ¶ 38; Resp. SMF ¶ 38.) The prisoner is not let out of the cell while on this status, except for an emergency. (SMF ¶ 39; Resp. SMF ¶ 39.)  Sub-acute status was for prisoners at a lesser level of risk and involves the prisoner being on a 15 minute watch (i.e., being observed by a guard at least every 15 minutes) and being allowed some items, including a jump suit and slippers and reading materials. (SMF ¶ 40; Resp. SMF ¶ 40.)  The prisoner on this status is let out of the cell for an hour a day for exercise (by himself). (SMF ¶ 41; Resp. SMF ¶ 41.)  Prisoners on these two statuses are housed in cells specifically set aside for these purposes. (SMF ¶ 42; Resp. SMF ¶ 42.)  Prisoners do not remain on either of these statuses any longer than necessary because the restrictions involved could contribute to emotional distress and thus delay the treatment process. (SMF ¶ 43; Resp. SMF ¶ 43.)  Stabilization status was for prisoners at a low risk and involves the prisoner being on the 30 minute watch that is the norm for prisoners housed outside the MHU and being allowed the same items as those other prisoners, including all normal items of clothing. (SMF ¶ 44; Resp. SMF ¶ 44.)  The prisoner on this status has many hours of out of cell time and may recreate with other prisoners in the Unit. (SMF ¶ 45; Resp. SMF ¶ 45.)  Prisoners on this status

11

are housed in regular cells assigned to them individually. (SMF ¶ 46; Resp. SMF ¶ 46.) The purpose of all this is to normalize the situation for these low risk prisoners in preparation for their transfer back to the general population of the facility. (SMF ¶ 47; Resp. SMF ¶ 47.)

On April 29, 2002, Dowling, along with several other members of the treatment team, met with Adam Dupuis, and they cleared him from the sub-acute status he had been placed on to go back to his regular cell (and, thus, on stabilization status) based on his then being a low risk. (SMF ¶ 48; Dowling Aff. ¶ 18.) At that time, Adam did not express any suicidal ideation. (SMF ¶ 49; Dowling Aff. ¶ 18.)[8]

The day after clearing Adam to go back to his regular cell, Dowling learned that Adam had asked to have his cell changed to one with fewer stimuli (i.e. less noise) but that he had become angry when not given the exact one he wanted. (SMF ¶ 50; Resp. SMF ¶ 50.) Dowling spoke with him about this and Adam then calmed down and stated he was feeling better. (SMF ¶ 51; Resp. SMF ¶ 51.)   On May 2, 2002, Dowling spoke to Adam about the results of his meeting with Dr. Corona and found out that Dr. Corona had chosen not to put Adam back on Xanax. (SMF ¶ 52; Resp. SMF ¶ 52.)  Adam was calm about the decision and denied suicidal or homicidal ideation. (SMF ¶ 53; Resp. SMF ¶ 53.)

During the days before his death, Dowling observed that Adam was playing cards and basketball with the other prisoners. (SMF ¶ 54; Dowling Aff.  ¶ 21.)[9]  Adam's mood, both when

---

[8]      Dupuis insists that Adam was at a high risk for suicide.  (Resp. SMF ¶¶ 48,49 citing SAMF ¶¶ 141, 142, 143, 145, and 196.)  With respect to the reliance on Paragraphs 141 through 145 of his statements of additional facts this assertion cannot be credited as previously explained.  Paragraph 196 gives Dr. Willson's opinion about the performance of Dr. Corona and Prison Health Services; it has no relevance to Dowling.

[9]      Dupuis qualifies this statement by asserting that there are no notes indicating that Adam Dupuis was seen be any mental health staff in the last three days of his life. (Resp. SMF ¶ 54, citing SAMF ¶ 144.)  Taking this statement at face value, the idea that there are no notes indicating that Adam Dupuis was seen be any mental health staff in the last three days of his life – in the context of the preceding concern about Adam—is troubling.  However, I feel constrained to disregard this attempted disputation because there is not basis to credit the Holbrook Affidavit and there is no independent record evidence that there are no notes for these three days.

Dowling observed him and talked to him during that time period, seemed to be good, but not overly so as to raise any concerns. (SMF ¶ 55; Resp. SMF ¶ 55.)  Based on Adam'a prior compliance with the "safety contract," future orientation, appropriate interacting with other prisoners, denial of suicidal ideation, and his mood, Dowling considered him at that time to be at low risk for suicide.  (SMF ¶ 56; Dowling Aff.  ¶ 23.)[10]  Dowling neither heard nor saw anything subsequently until Adam actually committed suicide to indicate otherwise. (SMF ¶ 57; Resp. SMF ¶ 57.)

On the day of Adam's suicide, Dowling was talking to other prisoners in their cells in a different part of the MHU as the cell doors were about to be opened to let the prisoners who were not on acute or sub-acute status out to the dayroom for recreation. (SMF ¶ 58; Resp. SMF ¶ 58.) Right after the doors were opened, Dowling heard another prisoner shout and saw a lot of commotion in the hallway outside Adam's cell, followed by guards racing to that area.  (SMF ¶ 59; Resp. SMF ¶ 59.)   Dowling proceeded down that way, behind the guards. (SMF ¶ 60; Resp. SMF ¶ 60.)  When he got to the area, he worked on calming down other prisoners there. (SMF ¶ 61; Resp. SMF ¶ 61.)  It was at that time that he first saw a piece of paper covering the inside of the window of Adam's cell. (SMF ¶ 62; Resp. SMF ¶ 62.) Dowling did not attempt to resuscitate Adam because he was not certified in CPR, guards were already at the cell, he felt he should stay out of the way of them and the medical staff, who were on their way, and he was engaged in calming down other prisoners. (SMF ¶ 63; Resp. SMF ¶ 63.)  The plaintiff has not designated any expert witness on the issue of CPR. (SMF ¶ 60; Resp. SMF ¶ 64.) The plaintiff brought a state action for professional negligence against Dowling and that action was dismissed on the ground of discretionary function immunity. (SMF ¶ 65; Resp. SMF ¶ 65.)

---

[10]     Dupuis does not admit to the reasonableness of Dowling's belief. (Resp. SMF ¶ 56.)

### *Attorney Smith's involvement*[11]

There is no dispute that in the fall of 2001, in conjunction with the Maine Civil Liberties Union ("MCLU"), the Maine Equal Justice Partners - through Rebekah Smith, Esq.- - undertook the representation of prisoners after the MCLU had received a variety of complaints from prisoners regarding mental health treatment. (SAMF ¶ 162; Reply S.M.F, ¶ 162.) Smith began representing Adam Dupuis in December of 2001. (SAMF ¶ 163; Reply S.M.F, ¶ 163.) Smith's chief contact person in discussing mental health management of prisoners was Joseph Fitzpatrick of the Department of Corrections. (SAMF ¶ 164; Reply S.M.F, ¶ 164.)  According to Smith, Adam's complaint was the medications he was being prescribed and the treatment that he was given was not sufficient to control his anxiety and his bi-polar disorder. (SAMF ¶ 166; Reply S.M.F, ¶ 166.)[12]  Smith discussed this explicitly with Fitzpatrick. (SAMF ¶ 167; Reply S.M.F, ¶ 167.)[13]

According to Dupuis, Attorney Smith knew that Adam felt very strongly - and the overt signs were very clear - that the medications chosen by Dr. Corona to replace Xanax were not working adequately.  (SAMF ¶ 171; Smith Dep at 31.)[14]  Dowling responds that the source of Smith's "knowledge" or direct observation regarding Adam was a "passing observation" that Adam "appeared very low in spirits" and add that this is a statement of opinion to which Smith is

---

[11]     Out of an abundance of caution, I have included some facts in the recitation below that may at the most be marginally material to Dupuis's claims against Dowling.

[12]     Dowling admits that Adam made this complaint for purposes of summary judgment but also argue that it is inadmissible hearsay.  (Reply SMF ¶ 166.)  Per my discussion of the hearsay concerns above, I will deem this statement 'admissible' for summary judgment purposes under Federal Rule of Evidence 807.

[13]     Dupuis asserts that in February of 2002, Adam father, Raymond Dupuis, called Smith and told her that Adam had attempted suicide two times.  Smith then called the Maine State Prison in Warren where Adam was housed several times and left a message for Adam.  (SAMF ¶ 168.)  He cites to page 15, lines 6 through 20, of Smith's deposition which, as the defendant points out, does not support this assertion. (Reply SAMF ¶ 168.) Dowling also objects on hearsay grounds. (Id.)

[14]     I agree with the defendants that the representations in Paragraphs 169 and 170 are inadmissible hearsay. (Reply SAMF ¶¶169, 170.)

not competent to testify.  (Reply SAMF ¶ 171; Smith Dep. at 16, 31- 32.)  Smith relates that Adam simply expected to be provided mental health treatment that would return him to the level of functions that he had previously experienced in prison; (SAMF ¶ 172; Smith Dep. at 32); this was simply a level where Adam was able to attend chow hall and go outside and do recreation where he wasn't overwhelmed by anxiety (SAMF ¶ 173; Smith Dep. at 32).[15]

On January 3, 2002, Adam wrote Smith a letter stating that Dr. Corona had decided a week or two previously to wean him off his anti-anxiety medication, Xanax.  (SAMF ¶ 177; Smith Aff. ¶ 2.)   On January 11, 2002, Dupuis wrote to Smith stating that Dr. Corona was still refusing to help him with Xanax. Adam told Dr. Corona that if he went off this medication he would get into trouble and do more time. Dr. Corona responded that he would just have to do more time then.  (SAMF ¶ 178; Smith Aff.  ¶ 3.)[16]

On January 18, 2002, Smith e-mailed Fitzpatrick indicating that Dr. Corona had discontinued Adam's Xanax.  Smith asked Fitzpatrick about current prescriptions and a treatment plan. (SAMF ¶ 179; Smith Aff. ¶ 4; Reply SAMF ¶ 179.)[17]  On January 24, 2002, Fitzpatrick responded to Smith indicating that he would look into it. On January 24, 2002, Fitzpatrick indicated to Smith that Adam had a significant history of drug abuse and they wanted to wean him off of Xanax and try something different, even though Adam was complaining that

---

[15]       The defendant objects to Paragraphs 172 and 173 on hearsay grounds.  (Reply SAMF ¶¶ 172, 173.) In my opinion for purposes of ruling on this motion for summary judgment the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule. I agree with them on their objection the contents of Paragraphs 174, 175, and 176.  (Reply SAMF ¶¶ 174, 175, 176.)  With regards to Paragraph 175, I note that there is no support for this statement in Smith's affidavit.
[16]       Dowling objects that Paragraphs 177 and 178 are inadmissible on hearsay grounds.  (Reply SAMF ¶¶ 177, 178.)  For purposes of ruling on this motion for summary judgment – and being extremely tolerant about the absence of the letter in the record -- the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.
[17]       The defendant interposes a hearsay objection to the extent the statement is based on statements by Adam to Smith.  Once again, for summary judgment purposes, I am regarding these statements as admissible pursuant to Federal Rule of Evidence 807.

he needed Xanax. (SAMF ¶ 180; Smith Aff. ¶ 5; Reply SAMF ¶ 180.) Dowling admits this

statement to the extent that the "they" referenced indicates Dr. Corona; he represents that he did

not have any part in this decision. (Reply SAMF ¶ 180; Dowling Aff. ¶ 6; Zubrod Aff. ¶ 6; SMF

¶¶ 8,9,10; Resp. SMP ¶¶ 8,9,10.) Fitzpatrick indicated to Smith that Adam was on a hunger

strike in protest to the medication change. (SAMF ¶ 181; Smith Aff. ¶ 6; Reply SMF ¶ 181.)

On February 11, 2002, Raymond Dupuis faxed Smith a letter indicating that Adam was

now completely off Xanax and was not feeling good. Adam was taking Paxil and Nortriptyline

which were not helping his anxiety. Now he was not going to recreation or chow hall because the

anxiety was so overwhelming. He felt he was a totally different person and he couldn't be around

people. He asked that Smith get a second opinion about the medication or call his father. (SAMF

¶ 181; Smith Aff. ¶ 6.)[18]

On February 11, 2002, Smith called Fitzpatrick and left a message, called Carol

Carruthers a mental health professional, and called Mary Lou Finneran, another health care

professional to determine whether or not the medication substitution was appropriate. (SAMF

¶ 182; Reply SAMF ¶ 182.) On February 21, 2002, Smith left a message for Fitzpatrick again.

Fitzpatrick indicated that Adam was fixated on getting his benzodiazepines and was frustrated

with the alternative antidepressants. (SAMF ¶ 183; Reply SAMF ¶ 183.) Fitzpatrick said that

none of the medical staff had seen any symptoms of anxiety attacks. (SAMF ¶ 184; Reply SAMF

¶ 184.) [19]

---

[18]        Dowling asserts that the statements of Raymond Dupuis to Smith as to what Adam Dupuis told Raymond
Dupuis are inadmissible hearsay and fault Dupuis for not introducing the letter into the record. (Reply SAMF
¶ 181.) I am troubled by the fact that Raymon Dupuis has not filed his own affidavit, thereby eliminating the double
hearsay aspect of this evidentiary question. However, this is something that could presumably be remedied at a trial
and I include the statements here.
[19]        On February 27, 2002, Smith met with prisoners at the Maine State Prison. (SAMF ¶ 184; Smith Aff. ¶ 9;
Reply SAMF ¶ 184.) In this statement Dupuis also indicates that Smith's work partner, Brian Wallace, of the

*Dupuis's expert*

Dupuis's expert witness, Dr. Shawn Willson, received specialized training in diagnosing and treating bi-polar disorder.  (SAMF ¶ 187; Reply SAMF ¶ 187.)

According to Dupuis, Prison Health Services showed deliberate indifference regarding the medical care of Adam Dupuis' bi-polar disorder. (SAMF ¶ 188; Willson Dep. at 37-38.)  Dr. Willson maintains that Prison Health Services disregarded Adam's safety when there was a potential serious harm involved. (SAMF ¶ 189; Willson Dep. at 38.)[20]

Dr. Willson maintains that Prison Health Services treated Adam as though he was simply an addict just wanting substances, thereby disregarding his depression, rages, and suicidal thoughts. (SAMF ¶ 190; Willson Dep. at 38.) She further opines that Dr. Corona is at fault for failing to inquire into the possible sources of Adam's chronic thoughts of killing himself. (SAMF ¶ 191; Willson Dep. at 46.)  Dr. Willson maintains that if Dr. Corona had inquired appropriately, Adam would have had a much better chance of surviving his stay in the MHU. (SAMF ¶ 121; Willson Dep. at 51.)[21]

Dr. Willson (who never even met Adam) opines that Adam suffered from bi-polar disorder, panic disorder, and alcohol dependency.  (SAMF ¶ 121; Willson Dep. at 29.)   Dowling responds that Dr. Corona diagnosed Adam with alcohol dependency at times of his life, but did not have active alcohol dependency during the months prior to his death.  (Reply SAMF ¶ 121; Corona Aff. ¶ 9.)  According to Dr. Willson, Paxil is used for panic and anxiety but it will

---

MCLU, met with Adam and indicated that Adam felt as though there was nothing that could be done for him at that point.  (SAMF ¶ 184.)  I agree with the defendant that representations of what Adam told Wallace, when supported only by the Smith Affidavit is inadmissible hearsay.

[20]       The defendant assert that these statements are inadmissible conclusory opinions.  (Reply SAMF ¶¶ 188, 189.)

[21]       Dowling denies all thee of these statements on the basis that they are characterization and are conclusory.  (Reply SAMF ¶¶ 190, 191, 192.)  What ever the merits of that objection, these representations all relate to Dr. Corona.

17

exacerbate a bi-polar disorder and that Paxil causes extreme agitation and possible mania which would increase the possibility of suicide.  (SAMF ¶¶ 194, 195; Willson Dep. at 32, 52.)  Dowling responds to these statements by indicating that the part about bi-polar disorder is inapplicable because Adam did not have that diagnosis at the relevant time.  (Reply SAMF ¶¶ 194, 195; Corona Aff. ¶ 9.)

According to Dr. Willson, Dr. Corona and Prison Health Services failed to monitor Adam closely enough given his high risk for suicide. (SAMF ¶ 196; Willson Dep. at 64.)  If Dr. Corona had conducted the proper inquiry regarding Adam's suicidal thoughts, Dr. Willson maintains, it would have altered his mental judgment in this case. (SAMF ¶ 196; Willson Dep. at 73-74.)  Had Dr. Corona continued to prescribe Xanax to Adam, Adam's risk of suicide would have been reduced by approximately 30%. (SAMF ¶ 196; Willson Dep. at 91.)[22]

### Adam's letters to his dad[23]

On Monday, February 11, 2002, Adam wrote to his father:

> I talked to Dr. Zoobrot [sic] and he told me I couldn't get a Dr. from the streets to see me. I think he might be lying to me but this is what it comes down to. I tried Dr. Corona's alternative medications, and I also do the meditation he told me to do, but I am still having problems. Since he first started decreasing my medication a month and a half ago I tried hanging myself, then again two weeks ago. That is not good, and if anything happens to me this place is in deep shit. I'm not trying to scare you I just want you to know what the medical Dept is doing to me. I'm gonna give them two week's [sic] to put me back on my xanax or I'll have to do something. I just can't take it I need help. I was fine before they took my medicine from me. I don't know what to do. Can you get your Lawyer to call Dr. Zoobrought [sic] and tell him if anything happens to me you are responsible. I

---

[22]       Dowling responds to these three paragraphs by reiterating a complaint that Dr. Willlson's testimony is not of fact but is a characterization and opinion. (Reply SAMF ¶¶ 196, 197, 198.)   This may be true but in the end there is no harm to Dowling as they all relate to Dr. Corona's liability, not Dowling's.

[23]       The plaintiffs object to all three of these paragraphs setting forth the letters Adam sent to his dad shortly before his suicide on the grounds that they are inadmissible hearsay statements.  While Dupuis might have taken more care in establishing the letters' authenticity, there is little question that they are in Adam's handwriting; Dupuis has included a copy of an envelope mailed from the prison to Raymond Dupuis which is post-marked February 13, 2002.  (Docket No. 118-4 at 5.) In my opinion for purposes of ruling on this motion for summary judgment the letters are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.

18

think that will change their minds. I have done everything I can do in here.  All I
get is lyes [sic] I'll let you go dad. I love you. Adam.

(SAMF ¶ 199; Docket No. 118-4 at 1-2.)

Adam sent another letter to his father dated April 29, 2002, which states in part:

Hi how are you? I'm doing better.  I just got out of 23 hr lockdown for 3 days.  I
went there my choice. I've been stressing out a lot lately. All the staff are lying to
me. And they all think I'm a drug addict trying to scam drugs from other inmates
and the doctor. I almost snapped on them Friday. I'm trying my best Dad but I
don't know if I'll be able to make it. Maby [sic] you can call here and talk to
Heartwell [sic] or Dr. Zoobrout [sic]. I was so wound up Friday I almost smashed
my tv and started cutting up with the glass. I'm doing a little better now but it's
just a matter of time before it happens again.

 (SAMF ¶ 200; Docket No. 118-4 at 3.)

The final letter from Adam, written May 6, 2002, contains the following passage:

        I told you people over and over again that I am going to snap, I just can't
take this pressure any more. That's why it is time for me to go. This world is too
stressful! for me you can't won't help me because you think I am out to scam
drug's, well after you find me hanging you might feel different about other
people.
        Please Lord forgive me for all my sins, I believe in you so hopefully I'll be
seeing you.  I am not a bad person.  Just made some bad choices.

(SAMF ¶ 201; Docket No. 118-4 at 4.)

### The four Zubrod paragraphs[24]

According to Stephen Zubrod, seven months prior to Adam's suicide, he was placed in

the MHU because, in the words of the Department of Corrections, "the prisoner may be: (1)

dangerous to self due to mental illness[;] (2) dangerous to others due to mental illness [;] (3)

unable to care for self due to mental illness." The handwritten notes from this document indicate

that "patient continues to exhibit dangerous threat to himself or others."  (SAMF ¶ 202; Zubrod

---

[24]        Dowling objects to Paragraphs 202, 204, and 205 on the ground that the Zubrod deposition is not part of the
record, however, I located it at Docket No. 111-3.

Dep. at 82.) Dr. Zubrod, the director of the MHU (and one of the correctional defendants), did not believe that hoarding drugs, or using drugs to self medicate, fit with his sense of who Adam was and Zubrod was not brought into that discussion. (SAMF ¶ 203; Zubrod Dep. at 105.) According to Zubrod, it would not be proper for medical personnel to perform blood screen tests to determine whether or not a patient/inmate was taking medicine that was not prescribed to him without providing that inmate/patient with the opportunity to give an informed consent.   (SMAF ¶ 204;  Zubrod Dep. at 105 -06.) Zubrod (speculates) that it would have be extremely upsetting to Adam if he was to know that his own clinicians were taking blood in order to perform toxicology screening without Adam's permission. (SAMF ¶ 105; Zubrod Dep. at 106.)

### *Analysis of Dowling's Liability under the Deliberate Indifference Standard*

To justify sending the question of Hartwell Dowling's liability under the Eighth Amendment deliberate indifference standard to the jury, Dupuis must create a genuine dispute of fact that Dowling was both aware "of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he also drew that inference.  Farmer, 511 U.S. at 837; see also Scott, 127 S. Ct. at 1776.   Under the First Circuit's tailored test there must be a genuine dispute that there was an unusually serious risk of suicide, Dowling had "actual knowledge of (or, at least, willful blindness to) that elevated risk," and he failed "to take obvious steps to address that known, serious risk."  Manarite, 957 F.2d at 956.

In the record set forth above, the following facts stand out as determinative of Dupuis's claims against Dowling under the Eighth Amendment. Dowling was responsible for performing psychosocial assessments for prisoners referred for admission to and admitted to the MHU.   He had no responsibilities with respect to medical issues, including issues of medication but as a member of the mental health staff he did determine the status of prisoners based on a direct

20

assessment, which would determine how often they were watched and what items they were allowed to have.  Dowling provided no supervision to the guards responsible for watch.

Dowling was Adam's primary clinician and he was aware that Dr. Corona took Adam off Xanax and put him on an alternative medication regimen.   Dowling had no part in this decision. Dowling brought Adam's desire to be put back on Xanax to Dr. Corona's attention on several occasions and  Dr. Corona stated each time that he felt that the alternative medication regimen was more appropriate for Adam, a determination Dowling had no reason to question. Dowling was aware that in 1998 Adam had cut himself on one wrist while at another correctional facility.

The latest treatment plan Adam and Dowling had agreed to was the April 10, 2002, treatment plan.  Adam had reported persistent thoughts of hurting others and occasional suicidal thoughts, but Dowling believed that he was at a low risk for committing suicide because he had not reported any intent or plan and had agreed to let staff know when he felt unsafe toward himself or others.  Dupuis does not dispute that Dowling held these beliefs but asserts that this belief was not reasonable. Although right after they agreed on his plan, Adam reported an "urge" to hurt himself, between the time of that report and April 26, 2002, Adam reported no suicidal or homicidal ideation and, although still anxious about his release, was future-oriented,  an outlook illustrated by his decision to pay for a new television.

There is absolutely no dispute that during the week of April 22, 2002, Dowling had been in daily contact with Adam to work on his anxiety issues and had encouraged Adam to maintain that contact. In addition, outside of regular work/on-call hours, on the evening of April 26, 2002, Dowling called into the prison to check on Adam, after Adam's angry outburst at a nurse earlier in the day about the lab test.  Dowling had no part in the ordering of the lab test.  Adam expressed distrust of Dowling concerning this issue but continued to work with Dowling. On the

evening when Dowling called into the prison to check on Adam, he was told by a guard that Adam had requested sub-acute status due to violent feelings. Dowling then contacted the on-call clinician himself to brief him on recent events and to ask for consideration as to whether Adam should be given to placing him on acute status. Dowling also knew that Adam was scheduled to see Dr. Corona on the coming Thursday to talk about Adam's desire to be put back on Xanax at night.

On April 29, 2002, Dowling, along with several other members of the treatment team, met with Adam and they cleared him from the sub-acute status to go back to his regular cell based on his then being a low risk. At that time, Adam did not express any suicidal ideation. Dupuis insists that Adam was a high risk of suicide but his record support for this crucial dispute is not cognizable as explained above. The day after Adam was cleared to go back to his regular cell, Dowling learned that Adam had asked to have his cell changed to one with less noise but that he had become angry when not given the exact one he wanted. Dowling spoke with Adam about this and Adam then calmed down and stated he was feeling better. On May 2, 2002, Dowling spoke to Adam and found out that Dr. Corona had chosen not to put Adam back on Xanax, but Adam was calm about the decision and denied suicidal or homicidal ideation.

During the days before his death Adam's mood, both when Dowling observed him and talked to him during that time period, seemed to be good. Based on Adam's prior compliance with the "safety contract," future orientation, appropriate interacting with other prisoners, denial of suicidal ideation, and his mood, Dowling considered him at that time to be at low risk for suicide. Dowling neither heard nor saw anything subsequently until Adam actually committed suicide to indicate otherwise.

22

Nothing in the statement of facts premised on Attorney Smith's interactions with the prison forward, in any meaningful way, Dupuis's claims against Dowling.   The same is true apropos the Dr. Willson deposition-dependant statements, they in no way indicate that Dr. Willson even considered Dowling's involvement in Adam's care.   In a similar vein, the four Zubrod paragraphs of fact in no way add value to Dupuis claims vis-à-vis Dowling.

With regards to the letters written by Adam to his father, the April 29, 2002, letter supports the conclusion that Adam wanted his father to contact Dowling or Stephen Zubrod in hopes that they would help address Adam's situation.   There is no evidence that Dowling ever saw this letter or was contacted by Adam's father.   At most the Court can draw an inference that the letters are indicative of how Adam was feeling when he wrote them and that Dowling should have been somewhat attuned to Adams state of mind as he admits that he was closely monitoring Adam during this period.

As the opponent of this motion for summary judgment, Dupuis must do more than simply show that there is some metaphysical doubt as to the material facts.  Scott, 127 S. Ct. at 1776. Taking this record as a whole as it pertains to Hartwell Dowling it could not lead a rational trier of fact to find for Dupuis and there is no genuine issue for trial. Id.   The most troubling fact in favor of Dupuis's claim against Dowling is that Dowling did participate in the assessment of Adam that led to his being on stabilization status at the time of his suicide which then determined how often Adam was watched and which items he was allowed.   However, there is no dispute that the members of the treatment team believed that this was the best course for Adam and there

is not sufficient evidence to draw and inference that this belief was a product of willful blindness on the part of Dowling.[25]

  The bottom line is that Dupuis's characterization of Dowling as having exhibited willful blindness to Adam's condition is entirely conclusory and rests on a contention that Dowling's beliefs about Adam's status – although admittedly subjectively held --  were objectively unreasonable. Dupuis's brevis discussion of the facts and his theory for recovery against Dowling under the Eighth Amendment in his opposition memorandum reveal how tenuous his argument is apropos Dowling.  (See Opp'n Mem. at 3-5.)  He highlights Dowling's concern about Adam and his efforts to maintain contact with Adam due to his anxiety, irritability, and frustration.  (Id. at 3.)  Dupuis maintains that Adam was "victimized by the Defendants' collective deliberate indifference" (id.. at 2- 3)  and maintains that the overall "course of care represents minimal mental health contact for the month leading up to Dupuis'[s] suicide and cannot be called reasonable treatment for a suicidal patient" (id. at 4).   This Court is required to examine the basis for each defendant's liability and cannot simply look at the situation as a whole and conclude that adding all the defendants' acts and omissions together is sufficient to hold them all liable.[26]  It goes without saying that the fact that Adam was able to take his own life when he was in the MHU and under the care of professional staff is a tragedy, and perhaps one that conceivably could have been avoided.  However,  when the facts are ciphered through the pleading standards of federal and local Rule 56 and, then, viewed through the prism of the Eighth Amendment deliberate indifference standard, Dupuis has not defeated Dowling's case for

---

[25]  This is a concern that Dupuis has not emphasized in responding to Dowling's dispositve motion..

[26]  In his opposition memorandum there is no indication that Dupuis seeks to hold Dowling responsible on a theory of supervisory liability. See Gaudreault v. Municipality of Salem, 923 F.2d 203, 209 (1st Cir. 1990).  The facts would not support such a claim.  He also acknowledges that Dowling was not a decision maker or policy maker for the MHU.  (Opp'n Mem. at  3 n.1.)

summary judgment, because there is "no genuine issue of material fact.'" Scott, 127 S. Ct. at

1776 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)).

### *Conclusion*

For the reasons set forth above, I recommend that the court grant summary judgment to

Hartwell Dowling (Docket No. 106).

### *NOTICE*

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, within ten (10) days of being served
with a copy thereof.  A responsive NOTICE memorandum shall be filed within
ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

March 7, 2008.                                    /s/Margaret J. Kravchuk
                                                 U.S. Magistrate Judge