United States District Court
District of Maine

RAYMOND DUPUIS, as Representative )
of the Estate of Adam Dupuis )
)
          Plaintiff, )
)
    v. )      Civ. No. 04-10-B-H
)
MARTIN MAGNUSSON, et al., )
)
          Defendants )

***RECOMMENDED DECISION ON MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT FILED BY STEPHEN ZUBORD (Docket No. 101)***

     Raymond Dupuis is seeking 42 U.S.C. § 1983 redress after his son, Adam Dupuis,

committed suicide at the Maine State Prison.  Dupuis alleges that the defendants were

deliberately indifferent to Adam's mental health medical needs and to the risk that his son would

commit suicide.[1]   One key issue in this case is the decision by Dr. Corona, a psychiatrist

employed by a private contractor, to take Adam Dupuis off Xanax and put him on an alternative

medication regimen.  This dispositive motion is filed by Defendant Stephen Zubrod, the Director

of Mental Health at the Maine State Prison at the relevant time, arguing that the court should

dismiss the complaint against him or, in the alternative, seeking summary judgment.  I

recommend that the Court grant summary judgment to Zubrod.

***DISCUSSION***

---

[1]     It is clear from Dupuis's memorandum in opposition to the Zubrod's motion that he is only pressing his claims under 42 U.S.C. § 1983 on a theory that Zubrod was deliberately indifferent to Adam's mental health needs in violation of the Eighth Amendment of the United States Constitution.
     With respect to Dupuis's efforts to seek redress under Maine law, this federal action was stayed to allow Dupuis to exhaust his medical malpractice screening panel process.  On November 15, 2007, the Maine Superior Court entered an order and judgment in the favor of Defendants Stephen Zubrod, Hartwell Dowling, Prison Health Services, Inc., and Doctor Alfonso Corona.  (See Docket No. 132-2; SMF ¶ 62; Resp. SMF ¶ 62.)

*Deliberate Indifference Standard*

In <u>Manarite v. City of Springfield</u>, the First Circuit described the Eighth Amendment deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts <u>intentionally</u> or with an analogous state of mind usually described as "<u>deliberate indifference</u>" to deprivation of the victim's constitutional right. <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); <u>Canton v. Harris</u>, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
>
> The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. <u>Canton</u>, 489 U.S. at 388 n. 7  ("some [lower] courts have held that a showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ... 'deliberate indifference'" ); <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986) (civil rights laws do not permit recovery based on simple negligence).
>
> Although some courts have used language suggesting that the deliberate indifference standard includes simple negligence- <u>see, e.g.</u>, <u>Elliott v. Cheshire County</u>, 940 F.2d 7, 10-11 (1st Cir.1991) (defendant "reasonably should have known" of detainee's suicidal tendencies)-in their application of the deliberate indifference standard, courts have consistently applied a significantly stricter standard. In <u>DeRosiers v. Moran</u>, 949 F.2d 15 (1st Cir.1991), for example, this court stated that deliberate indifference requires
>
>> the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain ... While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge [or willful blindness] of impending harm, easily preventable.
>
> <u>Id.</u> at 19 (citations omitted); <u>Gaudreault v. Salem</u>, 923 F.2d 203, 209 (1st Cir.1990) (standard of "'reckless' or 'callous' indifference" for supervisors' liability), <u>cert. denied</u>, 500 U.S. 956 (1991); <u>Walker v. Norris</u>, 917 F.2d 1449, 1455-56 (6th Cir.1990) ("deliberate indifference" standard in supervisory liability case); <u>Berry v. Muskogee</u>, 900 F.2d 1489, 1496 (10th Cir.1990) (same); <u>Sample v. Diecks</u>, 885 F.2d 1099, 1117-18 (3d Cir.1989) (same).
>
> The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the

2

> obvious, taken together, must show that the defendant is "deliberately indifferent"
> to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); accord Bowen v. City of Manchester, 966 F.2d 13, 17 (1st

Cir. 1992). The United States Supreme Court's  Farmer v. Brennan, 511 U.S. 825 (1994) cited

Manarite as one of the Circuit level cases requiring a showing of recklessness, as opposed to

mere negligence.  511 U.S. at 836.   Farmer made clear that to demonstrate recklessness

sufficient to hold a defendant liable under the Eight Amendment, "the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." Id. at  837.  Thus, the Manarite test is consistent

with Farmer and continues to be useful for correctional institution suicide cases because of its

tailored analysis. See also  Pelletier v. Magnusson, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002).

### Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in Scott v.

Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed.

Rule Civ. Proc. 56(c)).  Scott reemphasized, "'[w]hen the moving party has carried its burden

under Rule 56(c), its opponent must do more than simply show that there is some metaphysical

doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248

(1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.  Dupuis cannot defeat summary judgment by relying on "conclusory allegations, or rank speculation."  Mariani-Colon v. Dep't of Homeland Sec.,  511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

### Dupuis's Statement of Additional Material Facts and the Affidavit of Mark Holbrook, L.C.P.C.

Dupuis has filed a responsive statement of fact providing his paragraph-by-paragraph response to each statement forwarded by Zubrod.  In addition he has filed a statement of additional facts.  This statement of additional fact has 201 paragraphs (Docket No. 117-07) and is the same statement of additional fact that he filed in response to Defendant Fitzpatrick's dispositive motion (Docket No. 120-7). With regards to Defendant Dowling's and Defendants Corona/Prison Health Services Inc.'s dispositive motions Dupuis has include four additional paragraphs (see Docket Nos. 118-3 & 119-3).[2]

Of the 201 paragraphs of additional facts submitted by Dupuis, 161 rely on the affidavit of Mark Holbrook, L.C.P.C. for record support.  This affidavit is not signed by Holbrook, although Dupuis's attorney does notarize the non-existent signature.  Nowhere in the affidavit is there an indication of Holbrook's education or qualification or his grounds for making the sweeping representations of fact pertaining to Adam Dupuis and his treatment at the Maine State Prison.  Dupuis has filed as an attachment to his response to Zubrod's and Fitzpatrick's

---

[2]      Dupuis did not contest dispositive motions filed by Defendants Magnusson, Knight, and Ruggieri.  I have already issued recommended decisions on the dispositive motions filed by Defendants Magnusson, Knight, Ruggieri, and Fitzpatrick.
        At the same time I issue this recommended decision I am issuing recommended decisions on the dispositive motions filed by Hartwell Dowling and Dr. Corona/Prison Health Services, Inc.

dispositive motions a resume of Mark Holbrook which has an exhibit sticker indicating that it

was used in a 2005 proceeding.  (Docket No. 117-6.)  There is no record evidence – such as

medical records – to support the statements made in the Holbrook affidavit.   Many of

Holbrook's affidavit statements purport to attest to a great deal of factual familiarity with Adam's

condition, his treatment at the prison, the  staffing at the prison, his course of treatment (acts and

omissions), and Adam's state of mind in the time leading up to his suicide.  It seems that Dupuis

does <u>not</u> intend to rely on Holbrook at his expert witness; he includes in his statement of

additional facts paragraphs pertaining to the expert testimony of Doctor Shawn Willson.  (<u>See</u>

SAMF ¶¶ 187-198.)   Dupuis cites to a deposition by Doctor Willson in support of these

paragraphs.  I was able to locate this deposition at Docket No. 111-2.

> District of Maine Local Rule 56(f) provides:
>
> (f) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific
> Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if
> supported by record citations as required by this rule, shall be deemed admitted
> unless properly controverted. An assertion of fact set forth in a statement of
> material facts shall be followed by a citation to the specific page or paragraph of
> identified record material supporting the assertion. The court may disregard any
> statement of fact not supported by a specific citation to record material properly
> considered on summary judgment. The court shall have no independent duty to
> search or consider any part of the record not specifically referenced in the parties'
> separate statement of facts.

Dist. Me. Loc. R. 56(f).

The bottom line is that there is no way for this court to judge whether or not there is any

reason to credit the factual assertions contained in Holbrook's affidavit and the statements of

additional facts dependent on the affidavit.  This would be true even if the affidavit was signed,

although it is more troubling that these assertions are not signed and Dupuis has not attempted to

rectify the problem after reviewing the defendants' responses pointing out the defect.  Therefore, these statements of facts are not part of the record set forth below.

### Approach to the hearsay objections

The defendant makes numerous hearsay objections to Dupuis's statements of fact, including statements that rely on a deponent's testimony as to what Adam Dupuis told the deponent or letters written by Adam prior to his death.   In the facts that follow I have concluded that for purposes of addressing this summary judgment record I will consider many of the statements 'admissible' under Federal Rule of Evidence 807's residual exception to the hearsay rule when, "the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."  Fed. R. Evid. 807.

### Material Facts

Defendant Zubrod is a licensed clinical psychologist with a PhD. in psychology. He is not a psychiatrist or other type of medical professional and has no expertise in matters of medication. (SMF ¶ 1; Resp. ¶ SMF 1.)   At the time Adam Dupuis was last housed in the Maine State Prison Mental Health Stabilization Unit (MHU), starting on December 26, 2001, to his death on May 6, 2002, Zubrod was employed by the Maine Department of Corrections as the Director of Mental Health for the prison, working in the daytime Mondays to Fridays. (SMF ¶ 2; Resp. SMF ¶ 2.) As the Director of Mental Health, Zubrod was responsible for the overall operation of the MHU with respect to mental health treatment issues and provided general supervision and consultation to the mental health treatment staff, but he had no responsibilities with respect to medial issues, including issues of medication, and provided no supervision to medically trained staff.  (SMF

6

¶ 3; Resp. SMF ¶ 3.)  Zubrod had no responsibilities with respect to security issues, except that mental health staff did determine the status of prisoner, which, in turn, would determine how often they were watched, what items they were allowed to have, and how often they were allowed out of their cells.  (SMF ¶ 4; Resp. SMF ¶ 4.) He provided no supervision to the guards to make sure they kept the watch of otherwise, as that was the responsibility of security supervisors (sergeants, captain, etc.).  (SMF ¶ 5; Resp. SMF ¶ 5.)

Zubrod was a member of the treatment team for Adam Dupuis and participated in the team's discussions about his mental health treatment issues, but he was not his clinician and did not provide him psychotherapy.  (SMF ¶ 6; Resp. SMF ¶ 6.)  Zubrod did provide occasional counseling while making general rounds in the MHU. (SMF ¶ 7; Resp. SMF ¶ 7.)

Zubrod's experience with Adam's clinician, defendant Dowling, was that he is a caring professional who does excellent work.  (SMF ¶ 8; Resp. SMF ¶ 8.)  Zubrod was aware that during this time period, Dr. Corona, the psychiatrist, had determined to take Adam off Xanax and put him on an alternative medication regimen.  (SMF ¶ 9; Resp. SMF ¶ 9.)[3] Zubrod had no part in this decision.  (SMF ¶ 10; Resp. SMF ¶ 10.)

According to Zubrod, he was also aware that, while Adam sometimes indicated that the alternative medication regimen was helping him, as a general matter, he wanted to be put back on Xanax. (SMF ¶ 11;  Zubrod Aff. ¶ 7.)   Dupuis responds that Adam, more often than not, indicated that the alternative medication regimen was not helping him. (Resp. SMF ¶ 12; Corona Aff. ¶¶ 25, 26, 27.)

---

[3]     Dupuis notes that it is not clear what time period Zubrod is referring to in this statement.

There is not dispute that Zubrod brought Adam's wishes to Dr. Corona's attention on several occasions. (SMF ¶ 12; Resp. SMF ¶ 12.)  Dr. Corona stated each time that he felt that the alternative medication regimen was more appropriate for Adam. (SMF ¶ 13; Resp. SMF 13.) Zubrod claims that he had no reason to believe otherwise. (SMF ¶ 14; Zubrod Aff. ¶ 8.)  Dupuis responds that Adam indicated on multiple occasions that the medical regimen was not working for him.  (Resp. SMF ¶ 14;  Zubrod Aff.  ¶ 7.)

There is no dispute that Zubrod was not aware of any prior actual suicide attempts during Adam's incarceration with the Department of Corrections.  (SMF ¶ 15; Resp. SMF 15.)  Zubrod was aware that in 1998 Adam Dupuis had cut himself (on one wrist) while at another correctional facility, but he was also aware that Adam had admitted to faking severe psychiatric symptoms in order to be moved from that facility. (SMF ¶ 16; Resp. SMF 16.)  Regardless, Zubrod maintains, the length of time that had passed since Adam's cutting to the time period of his last housing in the MHU meant that it was not predictive of the then current risk of his committing suicide.  (SMF ¶ 17; Zubrod Aff. ¶ 9.) A suicide attempt ten years ago is no less relevant that a suicide attempt last week. (Resp. SMF ¶ 17;  Willson Dep. at  56.)  Zubrod was not aware of any choking incidents involving Adam Dupuis or any other active attempts by him to kill himself in the weeks before his death.  (SMF ¶ 18; Resp. SMF 18.)[4]  During that time period, Adam did not ever tell Zubrod that he was suicidal.  (SMF ¶ 19; Zubrod Aff. 10.)[5]

In fact, based on what Zubrod knew in the days up to and including the time of his death, it appeared to him that the risk of Adam committing suicide was low and that he was being

---

[4] Dupuis denies this statement without any explanation of the grounds of his denial or record citation.
[5] Dupuis purports to deny this statement on the grounds that "during this time" is too vague of a statement for an affidavit under Federal Rule of Civil Procedure 56(e).  (Resp. SMF ¶ 19.)

treated appropriately for what was reported to be an upsurge in anxiety due to his upcoming release from incarceration.  (SMF ¶ 20; Resp. SMF 20.)[6]

It is not unusual for a prisoner to be anxious about release, especially one with a history of anxiety like Adam.  (SMF ¶ 21; Resp. SMF 21.) In particular, with respect to what Zubrod knew in the days up to and including the time of the suicide, on April 29, 2002, a Monday, Zubord reviewed a note from Adam Dupuis' clinician, Hartwell Dowling, that stated that Dowling had been in daily contact with Adam during the prior week to work on his anxiety issues and had encouraged Adam to maintain that contact.  (SMF ¶ 22; Zubrod Aff. ¶¶ 12, 15; Treatment Summary Docket No. 103-2.)  The note also stated that on the evening of April 26, 2002, Dowling had called into the prison to check on Adam, who had had an angry outburst at a nurse earlier, and was told by a guard that Adam (who was on stabilization status) had requested sub-acute status due to violent feelings.  (SMF ¶ 23; Zubrod Aff. ¶¶ 12, 15; Treatment Summary Docket No. 103-2.)[7]  In the experience of Zubrod, it was not an unusual occurrence for a prisoner to make such a request.  (SMF ¶ 24; Resp. SMF ¶ 24.)  According to the note, Dowling had stated to the officer that this might be a good idea but that the guard needed to follow the protocol, which included contacting the on-call clinician. (SMF ¶ 25; Zubrod Aff. ¶¶ 12, 15; Treatment Summary Docket No. 103-2.) The note went on to state that Dowling then contacted the on-call clinician to brief him on recent events and suggested to him that he should find out if Adam's violent feelings were directed at himself and, if so, consideration should be given to placing him on acute status.  (SMF ¶ 26; Zubrod Aff. ¶¶ 12, 15; Treatment Summary Docket No. 103-2.)  The note also stated that Adam was scheduled to see Dr. Corona on the coming

---

[6]     Dupuis qualifies this statement with an argument that Zubrod's belief does not mean that the treatment was in fact appropriate.  (Resp. SMF ¶ 20.)

[7]     Dupuis asserts that these two paragraphs reflect hearsay statements; he apparently did not take into account the fact that Zubrod did file a copy of the treatment summary with his affidavit.

Thursday, an appointment which Zubrod presumed was to talk about his medication issues as they were also referenced in the note. (SMF ¶ 27; Zubrod Aff. ¶¶ 12, 15; Treatment Summary Docket No. 103-2.)[8]

Acute status was for prisoners at a high risk of suicide (or a high risk of harm to others) and involves the prisoner being placed on a constant watch by a guard and not having any items with which he could possibly hurt himself.  (SMF ¶ 28; Resp. SMF ¶ 28.)  The prisoner wears a safety smock -- essentially a gown made out of a thick untearable material.  (SMF ¶ 29; Resp. SMF ¶ 29.) The prisoner is not let out of the cell while on this status, except for an emergency. (SMF ¶ 30; Resp. SMF ¶ 30.)  Sub-acute status was for prisoners at a lesser level of risk and involves the prisoner being on a 15 minute watch (i.e., being observed by a guard at least every 15 minutes) and being allowed some items, including a jump suit and slippers and reading materials. (SMF ¶ 31; Resp. SMF ¶ 31.)  The prisoner on this status is let out of the cell for an hour a day for exercise (by himself).  (SMF ¶ 32; Resp. SMF ¶ 32.)   Prisoners on these two statuses are housed in cells specifically set aside for these purposes.  (SMF ¶ 33; Resp. SMF ¶ 33.)

Stabilization status was for prisoners at a low risk and involves the prisoner being on the 30 minute watch that is the norm for prisoners housed outside the MHU and being allowed the same items as those other prisoners, including all normal items of clothing.  (SMF ¶ 34; Resp. SMF ¶ 34.) The prisoner on this status has many hours of out of cell time and may recreate with other prisoners in the MHU.  (SMF ¶ 35; Resp. SMF ¶ 35.) Prisoners on this status are housed in regular cells assigned to them individually. (SMF ¶ 36; Resp. SMF ¶ 36.) The purpose of all this

---

[8]     Again, Dupuis asserts that these three paragraphs reflect hearsay statements,  not taking  into account the fact that Zubrod did file a copy of the treatment summary with his affidavit.

is to normalize the situation for these low risk prisoners in preparation for their transfer back to the general population of the facility.  (SMF ¶ 37; Resp. SMF ¶ 37.)

After reviewing the Dowling note, Zubrod, along with several other members of the treatment team, met with Adam, and they cleared him from the sub-acute status he had been placed on to go back to his regular cell (and, thus, on stabilization status) based on his then being a low risk.  (SMF ¶ 38; Resp. SMF ¶ 38.) At that time, Adam did not express any suicidal ideation. (SMF ¶ 39; Zubord Aff. 14.)[9]  Zubrod also confirmed that Adam had an appointment to see Dr. Corona on May 2, 2002.  (SMF ¶ 40; Resp. SMF ¶ 40.)

The next day after clearing Adam to go back to his regular cell, Zubrod learned that Adam had asked to have his cell changed to one with fewer stimuli (i.e. less noise) but that he had become angry when not given the exact one he wanted.  (SMF ¶ 41; Resp. SMF ¶ 41.) Zubrod was also told that after Dowling spoke with Adam, he had calmed down and stated he was feeling better.  (SMF ¶ 42;  Zubrod Aff. ¶ 16.)   Shortly after Adam's meeting with Dr. Corona, Zubrod learned of the results and found out that Dr. Corona had chosen not to put Adam back on Xanax but that Adam Dupuis was calm about the decision and denied suicidal or homicidal ideation. (SMF ¶ 43; Zubrod Aff. ¶  17.) Dupuis denies these statements (Resp. SMF ¶¶ 42, 43.) based on a legitimate hearsay objection if they are offered for purposes of establishing what Adam told a third party; however, they are admissible for purposes of describing Zubrod's state of mind.

---

[9]    Once again, Dupuis claims that it is unclear what time frame  Zubrod means when he indicates "at the time" in Paragraph 55 and then continues to object about this vagueness apropos the related statements Paragraphs 45-50.

Zubrod represents that he paid special attention to how Adam was acting during the week before his death. (SMF ¶ 44; Zubrod Aff. ¶ 18.)[10] He noted that Adam was playing cards and basketball with the other prisoners. (SMF ¶ 45; Zubrod Aff. ¶ 18.)  Zubrod also talked to him about his upcoming release during that week.  (SMF ¶ 46; Zubrod Aff. ¶ 19.) Adam told Zubrod he was "scared" about it, but that otherwise he was feeling okay. (SMF ¶ 47; Zubrod Aff. ¶ 19.)[11] Zubrod suggested coping strategies for dealing with that anxiety. (SMF ¶ 48; Zubrod Aff. ¶ 19.) Zubrod and Adam also discussed planning for his release and Adam expressed a willingness to meet with the caseworker to begin planning for his future in the community. (SMF ¶ 49; Zubrod Aff. ¶ 19.) Adam's mood, both when Zubrod observed him and talked to him, seemed to be upbeat. (SMF ¶ 50; Zubrod Aff. ¶ 20.)[12]

Based on Adam's futuristic planning, interacting with other prisoners, denial of suicidal ideation, stating that he felt okay other than being anxious about release, and his upbeat mood, Zubrod considered him at that time to be at low risk for suicide.  (SMF ¶ 51; Resp. SMF ¶ 51.) Zubrod neither heard nor saw anything after that -- until Adam actually committed suicide -- to indicate otherwise.  (SMF ¶ 52; Resp. SMF ¶ 52.)

On the day of Adam's suicide, Zubrod happened to be walking up the stairs to the floor where he was housed as the cell doors were being opened to let the prisoners who were not on acute or sub-acute status out to the dayroom for recreation. (SMF ¶ 53; Resp. SMF ¶ 53.) Zubrod had not been in that area when the prisoners were in their cells as a result of the normal

---

[10]     Dupuis denies this statement because of vagueness about time (Resp. SMF ¶ 44) but specifying a week before his death seems to provide sufficient definition given the failure of Dupuis to provide evidence that there were particularly critical moments in the week leading up to the suicide.

[11]     Dupuis maintains that Paragraph 47 does not provide a time-frame for the asserted fact,  is not supported by any medical notes and is hearsay.  With respect to the admissibility of this statement I conclude that they are admissible under Rule 807.  a

[12]     Dupuis adds that Zubrod's interpretation of Adam's mood may have been mistaken.  (Resp. SMF ¶ 50.) This may be true, but the <u>Farmer</u> standard is subjective.

lockdown at lunch time.  (SMF ¶ 54; Resp. SMF ¶ 54.) Right after the doors were opened,

Zubrod heard another prisoner scream and saw a lot of commotion around Adam's cell. (SMF

¶ 55; Resp. SMF ¶ 55.) He called for the guards, but they were already on their way. (SMF ¶ 56;

Resp. SMF ¶ 56.)  Then medical staff arrived in what seemed to him to be a short period of time.

(SMF ¶ 57; Resp. SMF ¶ 57.) Zubrod tried to calm down another prisoner who seemed

particularly upset and also worked with other mental health staff to check on and calm the other

prisoners who were there.  (SMF ¶ 58; Resp. SMF ¶ 58.)  It was then that Zubrod first saw a

piece of paper covering the inside of the window of Adam's cell.  (SMF ¶ 59; Resp. SMF ¶ 59.)

Zubrod did not attempt to resuscitate Adam as by the time he could have gotten through the

crowd of prisoners and guards, the medical staff was already there and he was engaged in

calming down prisoners and summonsing other mental health staff to help him with this. (SMF

¶ 60; Resp. SMF ¶ 60.)  Dupuis has not designated any expert witness on the issue of CPR.

(SMF ¶ 61; Resp. SMF ¶ 61.)

   *Attorney Smith's involvement[13]*

   There is no dispute that in the fall of 2001, in conjunction with the Maine Civil Liberties

Union ("MCLU"), the Maine Equal Justice Partners - through Rebekah Smith, Esq.-

- undertook the representation of prisoners after the MCLU had received a variety of complaints

from prisoners regarding mental health treatment. (SAMF ¶ 162; Reply S.M.F, ¶ 162.) Smith

began representing Adam Dupuis in December of 2001. (SAMF ¶ 163; Reply S.M.F, ¶ 163.)

Smith's chief contact person in discussing mental health management of prisoners was Joseph

Fitzpatrick of the Department of Corrections. (SAMF ¶ 164; Reply S.M.F, ¶ 164.)  According to

---

[13]     Out of an abundance of caution, I have included some facts in the recitation below that are at the most very
marginally material to Dupuis's claims against Zubrod.  In fact, if anything these facts contravene Dupuis's claim
against Zubrod.

Smith, Adam's complaint was the medications he was being prescribed and the treatment that he was given was not sufficient to control his anxiety and his bi-polar disorder. (SAMF ¶ 166; Reply S.M.F, ¶ 166.)[14]  Smith discussed this explicitly with Fitzpatrick. (SAMF ¶ 167; Reply S.M.F, ¶ 167.) [15]

According to Dupuis, Smith knew that Adam felt very strongly - and the overt signs were very clear - that the medications chosen by Dr. Corona to replace Xanax were not working adequately.   (SAMF ¶ 171; Smith Dep at 31.)[16]  The defendant responds that the source of Smith's "knowledge" or direct observation regarding Adam was a "passing observation" that he "appeared very low in spirits" and add that this is a statement of opinion that Smith is not competent to testify to.  (Reply SAMF ¶ 171; Smith Dep. at 16, 31- 32.)

According to Smith, Dupuis simply expected to be provided mental health treatment that would return him to the level of functions that he had previously experienced in prison. (SAMF ¶ 172; Smith Dep. at 32.) This level of function was simply a level where Adam was able to attend chow hall and go outside and do recreation where he wasn't overwhelmed by anxiety. (SAMF ¶ 173; Smith Dep. at 32.)[17]

---

[14]     The defendant admits that Adam made this complaint for purposes of summary judgment but also argue that it is inadmissible hearsay.  (Reply SMF ¶ 166.)

[15]     Dupuis asserts that in February of 2002, Adam father, Raymond Dupuis, called Smith and told her that Adam had attempted suicide two times.  Smith then called the Maine State Prison in Warren where Adam was housed several times and left a message for Adam.  (SAMF ¶ 168.)  He cites to page 15, lines 6 through 20, of Smith's deposition which, as the defendant points out, does not support this assertion. (Reply SAMF ¶ 168.) The defendant also object on hearsay grounds. (Id.)

[16]     I agree with the defendants that the representations in Paragraphs 169 and 170 are inadmissible hearsay. (Reply SAMF ¶¶169, 170.)

[17]     The defendant objects to Paragraphs 172 and 173 on hearsay grounds.  (Reply SAMF ¶¶ 172, 173.) In my opinion for purposes of ruling on this motion for summary judgment the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule. I agree with them on their objection to the contents of Paragraphs 174, 175, and 176.  (Reply SAMF ¶¶ 174, 175, 176.)  With regards to Paragraph 175, I note that there is no support for this statement in Smith's affidavit.

On January 3, 2002, Adam wrote Smith a letter stating that Dr. Corona had decided a week or two previously to wean him off his anti-anxiety medication, Xanax.  (SAMF ¶ 177; Smith Aff. ¶ 2.)   On January 11, 2002, Adam wrote to Smith stating that Dr. Corona was still refusing to help him with Xanax. Adam told Dr. Corona that if he went off this medication he would get into trouble and do more time. Dr. Corona responded that he would just have to do more time then.  (SAMF ¶ 178; Smith Aff.  ¶ 3.)[18]

On January 18, 2002, Smith e-mailed Fitzpatrick indicating that Dr. Corona had discontinued Adam's Xanax.  Smith asked Fitzpatrick about current prescriptions and a treatment plan. (SAMF ¶ 179; Smith Aff. ¶ 4; Reply SAMF ¶ 179.)[19]  On January 24, 2002, Fitzpatrick responded to Smith indicating that he would look into it. On January 24, 2002, Fitzpatrick indicated to Smith that Adam had a significant history of drug abuse and they wanted to wean him off of Xanax and try something different, even though Adam was complaining that he needed Xanax.  (SAMF ¶ 180; Smith Aff. ¶ 5; Reply SAMF ¶ 180.)  Zubrod admits this to the extent that the "they" referenced indicates Dr. Corona; he represents that he did not have any part in this decision.  (Reply SAMF ¶ 180; Dowling Aff. ¶ 6; Zubrod Aff. ¶ 6; SMF ¶¶ 8,9,10; Resp. SMP ¶¶ 8,9,10.)  There is no dispute that Fitzpatrick indicated to Smith that Adam was on a hunger strike in protest to the medication change. (SAMF ¶ 181; Smith Aff. ¶ 6; Reply SMF ¶ 181.)

---

[18]       The defendant objects that Paragraphs 177 and 178 are inadmissible on hearsay grounds.  (Reply SAMF ¶¶ 177, 178.)  For purposes of ruling on this motion for summary judgment – and being extremely tolerant about the absence of the letter in the record -- the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.

[19]       The defendant interposes a hearsay objection to the extent the statement is based on statements by Adam to Smith.  As already indicated, for summary judgment purposes I am regarding these statements as admissible pursuant to Federal Rule of Evidence 807.

On February 11, 2002, Raymond Dupuis faxed Smith a letter indicating that Adam was now completely off Xanax and was not feeling good. Adam was taking Paxil and Nortriptyline which were not helping his anxiety. Now he was not going to recreation or chow hall because the anxiety was so overwhelming. He felt he was a totally different person and he couldn't be around people. He asked that Smith get a second opinion about the medication or call his father.  (SAMF ¶ 181; Smith Aff. ¶ 6.)[20]

On February 11, 2002, Smith called Fitzpatrick and left a message, called Carol Carruthers a mental health professional, and called Mary Lou Finneran, another health care professional to determine whether or not the medication substitution was appropriate. (SAMF ¶ 182; Reply SAMF ¶ 182.)  On February 21, 2002, Smith left a message for Fitzpatrick again. Fitzpatrick indicated that Adam was fixated on getting his benzodiazepines and was frustrated with the alternative antidepressants. (SAMF ¶ 183; Reply SAMF ¶ 183.)   Fitzpatrick said that none of the medical staff had seen any symptoms of anxiety attacks.  (SAMF ¶ 184; Smith Aff. ¶ 9; Reply SAMF ¶ 184.)[21]

Additionally, Dupuis asserts, Zubrod had been made aware of the fact that Smith and Brian Wallace had contacted Fitzpatrick and indicated that, by taking Adam off Xanax and putting him on an alternative medical regimen, Adam was suffering serious mental health issues. (Resp. SMF ¶ 14; Fitzpatrick Aff. ¶¶ 8,9.)

---

[20]    The defendant assert that the statements of Raymond Dupuis to Smith as to what Adam Dupuis told Raymond Dupuis are inadmissible hearsay and fault Dupuis for not introducing the letter into the record.  (Reply SAMF ¶ 181.)  I am troubled by the fact that Raymond Dupuis has not filed his own affidavit, thereby eliminating the double hearsay aspect of this evidentiary question.  However, this is something that could presumably be remedied at a trial and I include the statements here.

[21]    In this statement Dupuis also indicates that on February 27, 2002, Smith met with prisoners at the Maine State Prison and that Smith's work partner, Brian Wallace, of the MCLU, met with Adam and indicated that Adam felt as though there was nothing that could be done for him at that point.  (SAMF ¶ 184.)  I agree with the defendant that the representation of what Adam told Wallace, when supported only by the Smith Affidavit, is inadmissible hearsay.   The fact that Smith met with other prisoners is not material.

### *Dupuis's expert*

Dupuis's expert witness, Dr. Shawn Willson, received specialized training in diagnosing and treating bi-polar disorder.  (SAMF ¶ 187; Reply SAMF ¶ 187.)

According to Dr. Willson, Prison Health Services showed deliberate indifference regarding the medical care of Adam's bi-polar disorder. (SAMF ¶ 188; Willson Dep. at 37-38.) Dr. Willson maintains that Prison Health Services disregarded Adam's safety when there was a potential serious harm involved. (SAMF ¶ 189; Willson Dep. at 38.)[22]

Dr. Willson maintains that Prison Health Services treated Adam Dupuis as though he was simply an addict just wanting substances, thereby disregarding his depression, rages, and suicidal thoughts. (SAMF ¶ 190; Willson Dep. at 38.)  She further opines that Dr. Corona is at fault for failing to inquire into the possible sources of Adam's chronic thoughts of killing himself. (SAMF ¶ 191; Willson Dep. at 46.)  Dr. Willson maintains that if Dr. Corona had inquired appropriately, Adam would have had a much better chance of surviving his stay in the MHU. (SAMF ¶ 121; Willson Dep. at 51.)[23]

Dr. Willson (who never met Adam) opines that Adam suffered from bi-polar disorder, panic disorder, and alcohol dependency.  (SAMF ¶ 121; Willson Dep. at 29.)  Zubrod responds that Dr. Corona diagnosed Adam with alcohol dependency at times of his life, but did not have active alcohol dependency during the months prior to his death.  (Reply SAMF ¶ 121; Corona Aff. ¶ 9.)  According to Dr. Willson, Paxil is used for panic and anxiety but it will exacerbate a bi-polar disorder and that Paxil causes extreme agitation and possible mania which would increase the possibility of suicide.  (SAMF ¶¶ 194, 195; Willson Dep. at 32, 52.) Zubrod

---

[22]       The defendant argues that these statements are inadmissible conclusory opinions.  (Reply SAMF ¶¶ 188, 189.)

[23]       The defendant denies all thee of these statements on the basis that they are characterization and are conclusory.  (Reply SAMF ¶¶ 190, 191, 192.)

responds to these statements by indicating that the part about bi-polar disorder is inapplicable because Adam did not have that diagnosis at the relevant time.  (Reply SAMF ¶¶ 194, 195; Corona Aff. ¶ 9.)

According to Dr. Willson, Dr. Corona and Prison Health Services failed to monitor Adam closely enough given his high risk for suicide. (SAMF ¶ 196; Willson Dep. at 64.)  If Dr. Corona had conducted the proper inquiry regarding Adam's suicidal thoughts, Dr. Willson maintains, it would have altered his mental judgment in this case (SAMF ¶ 196; Willson Dep. at 73-74) and had Dr. Corona continued to prescribe Xanax to Adam, Adam's risk of suicide would have been reduced by approximately 30% (SAMF ¶ 196; Willson Dep. at 91).[24]

***Adam's letters to his dad[25]***

On Monday, February 11, 2002, Adam wrote to his father:

I talked to Dr. Zoobrot [sic] and he told me I couldn't get a Dr. from the streets to see me. I think he might be lying to me but this is what it comes down to. I tried Dr. Corona's alternative medications, and I also do the meditation he told me to do, but I am still having problems. Since he first started decreasing my medication a month and a half ago I tried hanging myself, then again two weeks ago. That is not good, and if anything happens to me this place is in deep shit. I'm not trying to scare you I just want you to know what the medical Dept is doing to me. I'm gonna give them two week's [sic] to put me back on my xanax or I'll have to do something. I just can't take it I need help. I was fine before they took my medicine from me. I don't know what to do. Can you get your Lawyer to call Dr. Zoobrought [sic] and tell him if anything happens to me you are responsible. I think that will change their minds. I have done everything I can do in here.  All I get is lyes [sic] I'll let you go dad. I love you. Adam.

(SAMF ¶ 199; Docket No. 118-4 at 1-2.)

---

[24]     The defendant responds to these three paragraphs by reiterating a complaint that Dr. Willson's testimony is not of fact but is a characterization and opinion. (Reply SAMF ¶¶ 196, 197, 198.)

[25]     The plaintiffs object to all three of these paragraphs setting forth the letters Adam sent to his dad shortly before his suicide on the grounds that they are inadmissible hearsay statements.  While Dupuis might have taken more care in establishing the letters' authenticity, there is little question that they are in Adam's handwriting and Dupuis has included a copy of an envelope mailed from the prison to Raymond Dupuis which is post-marked February 13, 2002.  (Docket No. 118-4 at 5.)  For purposes of ruling on this motion for summary judgment the letters are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.

Adam sent another letter to his father dated April 29, 2002, which states in part:

Hi how are you?  I'm doing better.  I just got out of 23 hr lockdown for 3 days.  I went there my choice. I've been stressing out a lot lately. All the staff are lying to me. And they all think I'm a drug addict trying to scam drugs from other inmates and the doctor. I almost snapped on them Friday. I'm trying my best Dad but I don't know if I'll be able to make it. Maby [sic] you can call here and talk to Heartwell [sic] or Dr. Zoobrout [sic]. I was so wound up Friday I almost smashed my tv and started cutting up with the glass. I'm doing a little better now but it's just a matter of time before it happens again.

(SAMF ¶ 200; Docket No. 118-4 at 3.)

The final letter from Adam, written May 6, 2002, contains the following passage:

I told you people over and over again that I am going to snap, I just can't take this pressure any more. That's why it is time for me to go. This world is too stressful! for me you can't won't help me because you think I am out to scam drug's, well after you find me hanging you might feel different about other people.
Please Lord forgive me for all my sins, I believe in you so hopefully I'll be seeing you.  I am not a bad person.  Just made some bad choices.

(SAMF ¶ 201; Docket No. 118-4 at 4.)[26]

***Analysis of Zubrod's Liability under the Deliberate Indifference Standard***

---

[26]     The four statement of additional fact that Dupuis included in his pleading vis-à-vis Dowling's dispositive motion and not this one by Zubrod are as follows: Seven months prior to Adam's suicide, he was placed in the MHU because, in the words of the Department of Corrections, "the prisoner may be: (1) dangerous to self due to mental illness[;] (2) dangerous to others due to mental illness [;] (3) unable to care for self due to mental illness." The handwritten notes from this document indicate that "patien**t** continues to exhibit dangerous threat to himself or others." (SAMF ¶ 202; Zubrod Dep. at 82.) Dr. Zubrod, the director of the Mental Health Unit (and one of the correctional defendants), did not believe that hoarding drugs, or using drugs to self medicate, fit with his sense of who Adam Dupuis was and was not brought into that discussion. (SAMF ¶ 203; Zubrod Dep. at 105.) The defendants point out that there is evidence that Adam may have possessed a home brew in shampoo bottles. (Reply SAMF ¶ 203; Willson Dep. at 36-37.)  According to Zubrod, it would not be proper for medical personnel to perform blood screen tests to determine whether or not a patient/inmate was taking medicine that was not prescribed to him without providing that inmate/patient with the opportunity to give an informed consent.  (SMAF ¶ 204; Zubrod Dep. at 105 -06.) Zubrod (speculates) that it would have been extremely upsetting to Adam Dupuis if he was to know that his own clinicians were taking blood in order to perform toxicology screening without Adam's permission. (SAMF ¶ 105; Zubrod Dep. at 106.)  It is not clear to me if the omission of these four statements  was some sort tactical decision based on a thought that these statements favor Zubrod apropos his dispositive motion.

To justify sending the question of Stephen Zubrod's liability under the Eighth Amendment deliberate indifference standard to the jury, Dupuis must create a genuine dispute of fact that Zubrod was both aware "of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he also drew that inference. Farmer, 511 U.S. at 837; see also Scott, 127 S. Ct. at 1776.   Under the First Circuit's tailored test there must be a genuine dispute that there was an unusually serious risk of suicide, Zubrod had "actual knowledge of (or, at least, willful blindness to) that elevated risk," and he failed "to take obvious steps to address that known, serious risk." Manarite, 957 F.2d at 956.

In the record set forth above, the following facts stand out as determinative of Dupuis claims against Zubrod.  Zubrod was aware that Dr. Corona had determined to take Adam off Xanax and put him on an alternative medication regimen.  Zubrod had no part in this decision. Adam, more often than not, indicated that the alternative medication regimen was not helping him and Zubrod was aware of Adam's insistence on this score.  Zubrod brought Adam's wishes to Dr. Corona's attention on several occasions. Dr. Corona stated each time that he felt that the alternative medication regimen was more appropriate for Adam.

There is no dispute that Zubrod was not aware of any prior actual suicide attempts during Adam Dupuis's incarceration with the Department of Corrections.  He was aware that in 1998 Adam had cut one wrist while at another correctional facility, but he was also aware that Adam had admitted to faking severe psychiatric symptoms in order to be moved from that facility. Zubrod was not aware of any choking incidents involving Adam or any other active attempts by him to kill himself in the weeks before his death.  During that time period, Adam did not ever tell Zubrod that he was suicidal.  In the days up to and including the time of his death, it appeared to Zubrod that the risk of Adam committing suicide was low and that he was being treated

20

appropriately for what was reported to be an upsurge in anxiety due to his upcoming release from incarceration.

Zubord reviewed a note from Adam Dupuis' clinician, Hartwell Dowling, that on the evening of April 26, 2002, Dowling had called into the prison to check on Adam, who had had an angry outburst at a nurse earlier, and was told by a guard that Adam had requested sub-acute status due to violent feelings.  It was not an unusual occurrence for a prisoner to make such a request.  Zubrod knew that Dowling then contacted the on-call clinician to brief him on recent events and suggested to he should find out if Adam's violent feelings were directed at himself and, if so, consideration should be given to placing him on acute status.  Apparently the result was that Adam was place on sub-acute status.

 Zubrod, along with several other members of the treatment team, met with Adam, and they cleared him from the sub-acute status he had been placed on to go back to his regular cell on stabilization status based on his then being a low risk; at this juncture Adam did not express any suicidal ideation.  Zubrod also confirmed that Adam Dupuis had an appointment to see Dr. Corona on May 2, 2002.

Zubrod next learned that Adam had asked to have his cell changed to one with fewer stimuli but that he had become angry when not given the exact one he wanted. Zubrod learned that Dowling spoke with Adam and Adam had calmed down and stated he was feeling better.

Zubrod represents that he paid special attention to how Adam was acting during the week before his death.  He noted that Adam was playing cards and basketball with the other prisoners; he talked to Adam about his upcoming release and Adam told Zubrod he was "scared" about it, but that otherwise he was feeling okay; Zubrod suggested coping strategies for dealing with that anxiety; and they discussed planning for his release and Adam expressed a willingness to meet

21

with the caseworker to begin planning for his future in the community. Adam's mood, both when Zubrod observed him and talked to him, seemed to be upbeat.   Accordingly, Zubrod considered him at that time to be at low risk for suicide.  These facts are undisputed, aside from objections about the exact time-frame of these observations and discussion during the week preceding the suicide.  With respect to his objections that Zubrod's timeframe is vague, Dupuis has not presented cognizable evidence that there were particular points during the week leading up to Adam's suicide that are key to the deliberate indifference inquiry.

With regard's to Rebekah Smith's efforts, Zubrod had been made aware of the fact that both Smith and Brian Wallace had contacted Fitzpatrick and indicated that by taking Adam off Xanax and putting him on an alternative medical regimen and that through Smith it was relayed to Zubrod during the early winter months that Adam was suffering from serious mental health issues.

The expert testimony by Dr. Willson is expressly directed at Prison Health Services and Dr. Corona.  Most importantly, Dr. Willison faults Dr. Corona for not making sufficient inquiry into Adam's suicidal thoughts and for deciding to take Adam of Xanax (although she is even equivocal on this score).  There is nothing in this expert testimony that supports a claim that Zubrod was deliberately indifferent to Adam's mental health status; it does not appear on this record that Dr. Willson even considered Zubrod's conduct.

Finally, with regards to Adam's letters to his father, they indicate that Zubrod told Adam he could not get a doctor from the streets to see him and that Adam twice urged his father to contact Zubrod to apprise of the severity of the situation.  There is no record evidence that Raymond Dupuis actually contacted Zubrod and relayed Adam's messages.

As the opponent of this motion for summary judgment, Dupuis must do more than simply show that there is some metaphysical doubt as to the material facts. Scott, 127 S. Ct. at 1776. Taking this record as a whole as it pertains to Stephen Zubrod it could not lead a rational trier of fact to find for Dupuis and there is no genuine issue for trial. Id. This is a case where there is a palpable and painful factual dispute between the parties and it is tragic that Adam was able to take his own life on the MHU. Perhaps it could have been avoided.[27] But, when the facts are funneled through the pleading standards of federal and local Rule 56 and, then, viewed through the lens of the Eighth Amendment deliberate indifference standard, Dupuis has not defeated Zubrod's case for summary judgment, because there is "no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)).

In his memorandum opposing Zubrod's (and Defendant Fitzpatrick's) dispositive motion Dupuis maintains that Adam was "victimized by the Defendants' collective deliberate indifference in violation of his Constitutional rights." (Opp'n Mem. at 3.) This Court is required to parse the basis for each defendant's liability and cannot simply look at the situation as a whole and conclude that adding all the defendants' acts and omissions together is sufficient to hold them all liable.

I add that there is some record support that Zubrod had some supervisory liability over some of the members of Adam's team. However, he can be held liable as a supervisor "for the

---

[27]      The most troubling of the facts pertaining to Zubrod is his participation in the decision to place Adam back on a stabilization status after the April 26 incident in which Adam requested a greater level of protection. However, there is no dispute that the members of the treatment team believed that this was the best course for Adam and there is not sufficient evidence to draw any inference that this belief was a product of willful blindness on the part of Zubrod.

      On a related concern, in his opposition memorandum Dupuis faults the defendants for not forwarding an argument regarding the unconstitutional policies mentioned in the complaint. (Opp'n Mem. at 10.) He opines: "The fact that Adam Dupuis was permitted access to the tools of his demise constitutes knowledge of a potential harm and failure to act appropriately and lawfully under the circumstances." (Id. at 10.) Dupuis does not explain how it would be possible to hold Zubrod liable for the policy that permitted Adam to have access to the items he used to hang himself.

constitutional misconduct of [his subordinates] only on the basis of an 'affirmative link' between [his] acts and those of the offending employee." <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 209 (1st Cir. 1990) (quoting <u>Voutour v. Vitale</u>, 761 F.2d 812, 820 (1st Cir. 1985)).   That is he "can be held liable only on the basis of [his] own acts or omissions, amounting at the least to 'reckless' or 'callous' indifference to the constitutional rights of others." <u>Id.</u> (quoting <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 562 (1st Cir.1989)).   I am confident that this record does not create a trial-worthy issue of fact that Zubrod was responsible for an Eighth Amendment violation of a employee under his supervision; in particular, as to Hartwell Dowling, neither this record – nor the record forwarded by Dupuis in response to Dowling's dispositive motion-supports a conclusion that Dowling was deliberately indifferent to Adam's risk of suicide.

### *Conclusion*

For the reasons set forth above, I recommend that the court grant summary judgment to Stephen Zubrod (Docket No. 101).

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive NOTICE memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

March 7, 2008.                              /s/Margaret J. Kravchuk
                                           U.S. Magistrate Judge