United States District Court
District of Maine

RAYMOND DUPUIS, as Representative   )
of the Estate of Adam Dupuis   )
   )
       Plaintiff,   )
   )
   v.   )   Civ. No. 04-10-B-H
   )
MARTIN MAGNUSSON, et al.,   )
   )
       Defendants   )

### RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT FILED BY ALFONSO CORONA AND PRISON HEALTH SERVICES INCORPORATED (Docket No. 104)

In this civil action Raymond Dupuis is seeking 42 U.S.C. § 1983 redress after his son, Adam Dupuis, committed suicide at the Maine State Prison.  Dupuis alleges that the defendants were deliberately indifferent to Adam's mental health medical needs and to the attendant risk that his son would commit suicide.[1]  There are two sets of defendants – those employed by the State of Maine in its correctional facilities and the Prison Health Services Incorporated and its employee, Doctor Alfonso Corona.  This motion for summary judgment was filed by Prison Health Services and Doctor Corona.  A key factual issue underlying this dispute is Doctor Corona's decision to take Adam Dupuis off Xanax and put him on a different medication regiment even though Adam very much wanted to stay on Xanax.  After carefully scrutinizing

---

[1]     It is clear from Dupuis's memorandum in opposition to the motion for summary judgment that he is only pressing his claims under 42 U.S.C. § 1983 on a theory that the defendants were deliberately indifferent to Adam's mental health needs in violation of the Eighth Amendment of the United States Constitution.

     With respect to Dupuis's efforts to seek redress under Maine law, this federal action was stayed to allow Dupuis to exhaust his medical malpractice screening panel process.  On November 15, 2007, the Maine Superior Court entered an order and judgment in the favor of Defendants Stephen Zubrod, Hartwell Dowling, Prison Health Services, Inc., and Doctor Alfonso Corona.  (See Docket No. 132-2.)

the summary judgment record, I recommend that the Court grant the motion for summary

judgment as to both defendants.

## *DISCUSSION*

### *Deliberate Indifference Standard*

In Manarite v. City of Springfield, the First Circuit described the Eighth Amendment

deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally or with an analogous state of mind usually described as "deliberate indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); Estelle v. Gamble, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
>
> The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. Canton, 489 U.S. at 388 n. 7 ("some [lower] courts have held that a showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ... 'deliberate indifference'" ); Daniels v. Williams, 474 U.S. 327, 328 (1986) (civil rights laws do not permit recovery based on simple negligence).
>
> Although some courts have used language suggesting that the deliberate indifference standard includes simple negligence- see, e.g., Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir.1991) (defendant "reasonably should have known" of detainee's suicidal tendencies)-in their application of the deliberate indifference standard, courts have consistently applied a significantly stricter standard. In DeRosiers v. Moran, 949 F.2d 15 (1st Cir.1991), for example, this court stated that deliberate indifference requires
>
>> the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain ... While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge [or willful blindness] of impending harm, easily preventable.
>
> Id. at 19 (citations omitted); Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir.1990) (standard of "'reckless' or 'callous' indifference" for supervisors' liability), cert. denied, 500 U.S. 956 (1991); Walker v. Norris, 917 F.2d 1449, 1455-56 (6th Cir.1990) ("deliberate indifference" standard in supervisory liability

2

case); <u>Berry v. Muskogee</u>, 900 F.2d 1489, 1496 (10th Cir.1990) (same); <u>Sample v. Diecks</u>, 885 F.2d 1099, 1117-18 (3d Cir.1989) (same).

  The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); <u>accord</u> <u>Bowen v. City of Manchester</u>, 966 F.2d 13, 17 (1st Cir. 1992). The United States Supreme Court's <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) cited <u>Manarite</u> as one of the Circuit level cases requiring a showing of recklessness, as opposed to mere negligence. 511 U.S. at 836. <u>Farmer</u> made clear that to demonstrate recklessness sufficient to hold a defendant liable under the Eight Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. Thus, the <u>Manarite</u> test is consistent with <u>Farmer</u> and continues to be useful for correctional institution suicide cases because of its tailored analysis. <u>See</u> <u>also</u> <u>Pelletier v. Magnusson</u>, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002).

### *Summary Judgment Standard*

  "At the summary judgment stage," the United States Supreme Court explained in <u>Scott v. Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)). <u>Scott</u> reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" <u>Id.</u> (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

### Dupuis's Statement of Additional Material Facts and the Affidavit of Mark Holbrook, L.C.P.C.

Dupuis has filed a responsive statement of fact providing his paragraph-by-paragraph response to each statement forwarded by the defendants. In addition he has filed a statement of additional facts. This statement of additional facts has 205 paragraphs. (Docket No. 118-03.) This is the same statement of additional facts as filed in his response to Defendant Dowling's dispositive motion (see Docket No. 119-3); with respect to Defendant Zubrod's and Defendant Fitzpatrick's dispositive motions Dupuis has submitted a statement of additional facts that has 201 paragraphs (see Docket No. 117-7).[2]

Of the 205 paragraphs of additional facts submitted by Dupuis, 161 rely on the affidavit of Mark Holbrook, L.C.P.C. for record support. This affidavit is not signed by Holbrook, although Dupuis's attorney does notarize the non-existent signature. Nowhere in the affidavit is there an indication of Holbrook's education or qualification or his grounds for making the sweeping representations of fact pertaining to Adam Dupuis and his treatment at the Maine State

---

[2]     Dupuis did not contest dispositive motions filed by Defendants Magnusson, Knight, and Ruggieri. I have already issued recommended decisions on the dispositive motions filed by Defendants Magnusson, Knight, Ruggieri, and Fitzpatrick. At the same time I issue this recommended decision I am issuing recommended decisions on the dispositive motions filed by Stephen Zubrod and Hartwell Dowling.

Prison.  Dupuis has filed as an attachment to his response to Zubrod's and Fitzpatrick's dispositive motions a resume of Mark Holbrook which has an exhibit sticker indicating that it was used in a 2005 proceeding.  (Docket No. 117-6.)  There is no record evidence – such as medical records – to support the statements made in the Holbrook affidavit.   Many of Holbrook's affidavit statements purport to attest to a great deal of factual familiarity with Adam's condition, his treatment at the prison, the staffing at the prison, his course of treatment (acts and omissions), and Adam's state of mind in the time leading up to his suicide.  It seems that Dupuis does not intend to rely on Holbrook at his expert witness; he includes in his statement of additional facts paragraphs pertaining to the expert testimony of Doctor Shawn Willson.  (See SAMF ¶¶ 187-198.)   Dupuis cites to a deposition by Doctor Willson in support of these paragraphs.  I was able to locate this deposition at Docket No. 111-2.

> District of Maine Local Rule 56(f) provides:
>
> (f) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(f).

The bottom line is that there is no way for this court to judge whether or not there is any reason to credit the factual assertions contained in the Holbrook affidavit and the statements of additional facts dependent on the affidavit.  This would be true even if the affidavit was signed, although it is more troubling that these assertions are not signed and Dupuis has not attempted to

rectify the problem after reviewing the defendants' responses pointing out the defect.  Therefore, these statements of facts are not part of the record set forth below.

### Approach to the hearsay objections

The defendants make numerous hearsay objections to Dupuis's statements of fact, including statements that rely on a deponent's testimony as to what Adam Dupuis told the deponent or letters written by Adam prior to his death.   In the facts that follow I have concluded that for purposes of addressing this summary judgment record I will consider many of the statements 'admissible' under Federal Rule of Evidence 807's residual exception to the hearsay rule when, "the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."  Fed. R. Evid. 807.

### Material Facts

In 1998 Adam Dupuis, was placed in the custody of the Maine Department of Corrections for a period of four years. (SMF ¶ 1; Resp. SMF ¶ 1.)  Adam committed suicide while incarcerated in the Mental Health Unit (MHU) of the Maine State Prison (MSP) on May 6, 2002. (SMF ¶ 2; Resp. SMF ¶ 2.)  At the time of Adam's death, Prison Health Services Incorporated (PHS) contracted with the Department of Corrections to provide medical care to the inmates at the Maine State Prison. (SMF ¶ 3; Resp. SMF ¶ 3.)

On October 15, 2001, defendant Alfonso Corona, M.D. was employed by PHS to provide psychiatric consultation and medication management to inmates at various facilities operated by the Maine Department of Corrections, including the Maine State Prison. (SMF ¶ 4; Resp. SMF ¶ 4.)  Care of inmates on the MSP's MHU was provided primarily by the treatment team, which

6

consisted of a counselor or therapist, a mental health worker, a member of the security force, and the psychiatric nurse. (SMF ¶ 5; Resp. SMF ¶ 5.)  Dr. Corona was usually present at the prison two days a week. (SMF ¶ 6; Resp. SMF ¶ 6.)   On Thursdays, Dr. Corona would consult with inmates in an "outpatient" clinic, i.e., where he would see inmates who were in the general population. On Tuesday mornings he would consult with treatment teams in the MHU on medical management issues and on Tuesday afternoons he would provide medical management consultations for inmates in other parts of the prison, such as the maximum security wing. (SMF ¶ 7; Resp. SMF ¶ 7.)  The treatment team decided what inmates to schedule to see Dr. Corona on his days at the prison and provided information to him as to what problems or complaints an inmate had that required the doctor's attention. (SMF ¶ 8; Resp. SMF ¶ 8.)  Members of the treatment team had day-to-day contacts with the inmates on the MHU.  (SMF ¶ 9.)[3]  Dr. Corona relied on information given to him by members of the treatment team when making decisions regarding inmates' medications. (SMF ¶ 10; Resp. SMF ¶ 10.)

Members of Adam Dupuis's treatment team included Hartwell Dowling, a therapist, and Anne Marie Halco, a psychiatric nurse. (SMF ¶ 11; Resp. SMF ¶ 11.)  Over the months that Dr. Corona interacted with the team, he believed they had Adam's best interests at heart and were genuinely trying to help him with his anxiety and depression. The doctor felt comfortable in relying on the information and observations that members of the team conveyed to him about

---

[3]        Dupuis denies this statement asserting: "There are no notes relating to Adam Dupuis' mental health treatment on any of the three days prior to his suicide." (Resp. SMF ¶ 9.)  He cites to his statement of additional fact ¶144.)  This paragraph relies on the unsworn Holbrook affidavit.

Adam in deciding what medications would be appropriate for treating his symptoms. (SMF ¶ 12.)[4]

The MHU contained different subunits which provided various levels of observation of inmates depending on their risk of injury to themselves or other inmates. (SMF ¶ 13; Resp. SMF ¶ 13.) Dr. Corona was not usually consulted in determining on which subunit an inmate should be housed. He felt it preferable to leave these decisions to the treatment team, since they had daily contact with the inmates. Specifically, Dr. Corona did not participate in any decisions regarding which subunit Adam was assigned to. (SMF ¶ 14; Resp. SMF ¶ 14.)  Dr. Corona's involvement in the care of Adam in the months before his suicide consisted of consulting with the treatment team, meeting with the inmate, reviewing his records and prescribing proper medical treatment. During meetings with the inmate, one or more members of the treatment team would be present, and the doctor would rely on the team members to provide information about how the inmate was doing. (SMF ¶ 15.)[5]

Dr. Corona first encountered Adam Dupuis on December 13, 2001.  At that time, Adam had been receiving 8 mg of Xanax a day.  Xanax is usually used as a short term medication for patients experiencing panic attacks, but it is addictive and patients can experience withdrawal symptoms if it is discontinued abruptly.  Eight mg is a very high dose of Xanax. (SMF ¶ 16; Resp. SMF ¶ 16.)  Dr. Corona performed an assessment of Adam.  Despite his medication, Adam reported frequent panic attacks.  He reported thoughts of killing himself when he was released

---

[4]     Dupuis qualifies this assertion with a conclusory assertion – unsupported by a record citation --  that Dr. Corona's comfort with the information and observations was not reasonable given the circumstances.  (Resp. SMF ¶ 12.)

[5]     Dupuis denies this statement by citing to his statement of additional facts  ¶¶ 145, 191, 192, 194. Paragraph 145 relies on the unsworn Holbrook affidavit.  Paragraphs 191, 192, and 194 are paragraphs  relying on Dr. Willson's testimony which Dupuis believes establish the proposition the Dr. Corona did not provide proper medical treatment.  These paragraphs do not counter the specific factual statement of Paragraph 15 of the defendants' statement of fact.

8

from prison but did not report a specific plan or intention to do this.  He was coherent and engaged without any signs of psychosis and denied auditory hallucinations.  He had a history of drug and alcohol abuse.  Dr. Corona diagnosed anxiety and depression. (SMF ¶ 17; Resp. SMF ¶ 17.)  Based on his assessment, Dr. Corona determined that Xanax was not an appropriate medication for Adam Dupuis.  He discussed this with Adam and also discussed other possible medical treatment, but Adam was unwilling to try any other treatment at the time.  The doctor ordered that Xanax be tapered off very slowly. (SMF ¶ 18: Resp. SMF ¶ 18.)[6]

Dr. Corona next saw Adam on December 27, 2001.  Adam reported being very uncomfortable discontinuing Xanax.  They discussed other medications, and Dr. Corona prescribed Remeron, a medication used to treat depression and anxiety. (SMF ¶ 19: Resp. SMF ¶ 19.)

At that time, PHS maintained a formulary, i.e., an approved list of medications that its physicians were allowed to prescribe.  Dr. Corona was required to obtain approval of the medical director to prescribe medications not in the formulary.  However, requests for prescriptions outside the formulary were routinely approved. Both Remeron and Paxil (which the doctor later prescribed for Adam) were outside the formulary, but Dr. Corona had no problem obtaining approval to prescribe them.  (SMF ¶ 20: Resp. SMF ¶ 20.)

On January 8, 2002, Adam still complained about tapering off Xanax and stated that the Remeron was not helping him.  Adam requested that the doctor prescribe Paxil, an anti-depressant medication also used to treat panic disorder, and the doctor agreed to do so.  (SMF ¶ 21: Resp. SMF ¶ 21.)   Dr. Corona next saw Adam on January 23, 2002.  Adam had reported to

---

[6]      Cross referencing a statement of fact to come, Dupuis qualifies this assertion by noting that Adam was on 8 mg of Xanax a day as of December 16, 2001, and was completely off Xanax as of February 26, 2002.  (Resp. SMF ¶ 18; SMF ¶  26.)  This appears to be an effort to suggest that the tapering was not very slow.

his therapist an auditory hallucination of hearing his name called.  The therapist advised Dr.

Corona that Adam had reported this happening before but then had admitted to having made it

up.  Dr. Corona explained to Adam the risk of providing misinformation about his symptoms,

specifically that this might cause his providers to prescribe an incorrect medication for him.

(SMF ¶ 22: Resp. SMF ¶ 22.)  At that time Adam proposed that the doctor prescribe Imipramine,

a tricyclic antidepressant.  The doctor declined to do this out of concern for possible side effects.

Instead, the doctor decided to try Nortriptyline, a different tricyclic anti-depressant which can

often complement the effect of the Paxil Adam was taking. (SMF ¶ 23: Resp. SMF ¶ 23.)

The doctor next saw Adam on January 30, 2002.  Adam reported that he was sleeping

better with the Nortriptyline and that his anxiety was better with the Paxil.  He appeared more

cooperative and compliant with his medication and his mood was good.  The doctor decided to

increase the dose of Nortriptyline to improve the effect and he noted that staff should watch for

interactions between the two medications.  (SMF ¶ 24: Resp. SMF ¶ 24.)  On February 12, 2002,

Adam complained that the Paxil was not effective, so the doctor increased his dose of Paxil at

that time.  Adam appeared alert and oriented without runaway thoughts or flight of ideas.  (SMF

¶ 25: Resp. SMF ¶ 25.)

The doctor next encountered Adam on February 26, 2002.  The Xanax taper had been

completed, and Adam was upset that he was no longer receiving Xanax.  He claimed to have

attempted to commit suicide twice, but members of the treatment team told the doctor that this

had not occurred, and no incident was documented in the patient's records. (SMF ¶ 26: Resp.

SMF ¶ 26.)  On that occasion, Adam told the doctor he felt like attempting suicide.  Dr.

Corona believed that Adam was attempting to manipulate him into prescribing the medicine he wanted and he told Adam so.  Adam became upset and started using foul language and eventually left the session. (SMF ¶ 27: Resp. SMF ¶ 27.)

Dr. Corona saw Adam Dupuis again on February 28, 2006.  It was reported that Adam was doing better at that time and he admitted he was having a better day, although he continued to request Xanax. (SMF ¶ 28: Resp. SMF ¶ 28.)

Dr. Corona next encountered Adam Dupuis on March 21, 2002.  Adam advised the doctor that he was improving with Paxil but complained of mood instability and insomnia. Adam requested a prescription of Trazadone, an anti-depressant, and the doctor agreed to try him on that medication.  (SMF ¶ 29: Resp. SMF ¶ 29.)

On April 4, 2002, Adam reported to Dr. Corona that he was having trouble coping with his impending release from prison.  Adam reported some continuing anxiety but felt that the Paxil was helping.  He requested an additional medication and Dr. Corona prescribed Depakene, an anti-convulsant which also augments other medications used to treat anxiety and depression. (SMF ¶ 30: Resp. SMF ¶ 30.)

According to these defendants, at the request of treatment team members, Dr. Corona ordered a blood toxicology screen on Adam Dupuis on April 18, 2002.  The team expressed the suspicion that Adam had illicitly obtained some Elavil, an anti-depressant that can interact negatively with Paxil. (SMF ¶ 31.)

Dupuis responds that Hartwell Dowling (one of the correctional defendants) has described under oath that he had no part in the ordering of lab tests.  He assumed, that when he was told about it, that it had been done pursuant to proper medical protocol.  (Resp. SMF ¶ 31;

Dowling Aff. ¶ 13.)[7]  In responding to these statements Dupuis points out that seven months

prior to Adam's suicide, he was placed in the MHU because, in the words of the Department of

Corrections, "the prisoner may be: (1) dangerous to self due to mental illness[;] (2) dangerous to

others due to mental illness [;] (3) unable to care for self due to mental illness."  The handwritten

notes from this document indicate that "patient continues to exhibit dangerous threat to himself

or others."  (SAMF ¶ 202; Zubrod Dep. at 82.) Dr. Zubrod, the director of the Mental Health

Unit (and one of the correctional defendants), did not believe that hoarding drugs, or using drugs

to self medicate, fit with his sense of who Adam was and was not brought into that discussion.

(SAMF ¶ 203; Zubrod Dep. at 105.)  The defendants point out that there is evidence that Adam

may have possessed a home brew in shampoo bottles.  (Reply SAMF ¶ 203; Willson Dep. at 36-

37.)  According to Zubrod, it would not be proper for medical personnel to perform blood screen

tests to determine whether or not a patient/inmate was taking medicine that was not prescribed to

him without providing that inmate/patient with the opportunity to give an informed consent.

(SMAF ¶ 204;  Zubrod Dep. at 105 -06.) Zubrod (speculates) that it would have been extremely

upsetting to Adam Dupuis if he were to know that his own clinicians were taking blood in order

to perform toxicology screening without Adam's permission. (SAMF ¶ 105; Zubrod Dep. at

106.) [8]

    Dr. Corona met for the last time with Adam Dupuis on May 2, 2002.  At that time, Adam

complained of decreased concentration, restlessness, and vague suicidal thoughts.  He did not

---

[7]    Also in this responsive statement of fact Dupuis, without any record citation, asserts that the only other
"treatment team"  member was Nurse Halco.  However, the defendants's Paragraph 11 does assert that Dowling and
Halco were the members of Adam's treatment team.

[8]    The defendants object to the Zubrod-deposition-dependant  statements on the ground that the cited Zubrod
deposition is not part of the record.  (Reply SAMF ¶¶ 202, 203, 204, 205.) The Zubrod deposition transcript can be
found at Docket No. 111-3;  it would have been much better practice if Dupuis had at least cited to where the
deposition can be located on the docket.

appear to be in distress but rather was reading his symptoms from a piece of paper he had with him.  He continued to request Xanax.  He told Dr. Corona that he had tried to choke himself with a plastic bag, but the treatment team member present said this had not occurred.  Dr. Corona asked Adam if he was really going to do something, and Adam said no.  He requested an additional medication, Tegretol, another medication that works well to treat anxiety and depression, and Dr. Corona agreed to prescribe it. (SMF ¶ 32: Resp. SMF ¶ 32.)

Dr. Corona was not present at the prison when Adam took his own life on May 6, 2002, and has no first-hand knowledge of the event.  (SMF ¶ 34: Resp. SMF ¶ 34.)[9]  Dr. Corona was very surprised when he learned that Adam had killed himself.  (SMF ¶ 35: Resp. SMF ¶ 35.)  Dr. Corona believed that the medication he had prescribed for Adam, particularly the Paxil, was helping to control his anxiety and depression.  (SMF ¶ 36: Resp. SMF ¶ 36.)  Dr. Corona was aware that over the years of his incarceration, Adam had exhibited some risk for suicide, but he did not believe that Adam was an acute risk for suicide during the months that the doctor treated him.  (SMF ¶ 37: Corona Aff. ¶ 22; Resp. SMF ¶ 37.)  Dr. Corona believed that the threat of suicide some months before Adam's death was an attempt to manipulate the doctor into prescribing Adam's drug of choice. (SMF ¶ 38;  Corona Aff. ¶  22; Resp. SMF ¶ 38.) The treatment team did not tell Dr. Corona that they felt Adam was an imminent threat to commit suicide and Dr. Corona believed that Adam's care was being appropriately managed by the MHU staff.  (SMF ¶ 39; Corona Aff. ¶  22; Resp. SMF ¶ 39.) [10]

***Dupuis's expert***

---

[9]      There is no Paragraph 33 in the defendants' statement of facts.

[10]      Dupuis argues that, while he admits that Paragraphs 37, 38, and 39 accurately describe Corona's state of mind, his beliefs were not reasonable.

Dupuis's expert witness, Dr. Shawn Willson, received specialized training in diagnosing and treating bi-polar disorder.  (SAMF ¶ 187; Reply SAMF ¶ 187.)  For the majority of patients in Dr. Willson's practice, the bulk of the therapy is performed by a non-medical therapist, with Dr. Willson consulting with the patients primarily for assessment and medical management.  She will see these patients one or two weeks after starting them on medication and then spread the visits out to a month or six weeks. (SMF ¶ 56; Resp. SMF ¶ 56; Willson Dep. at  1.)

According to Willson, Prison Health Services showed deliberate indifference regarding the medical care of Adam's  bi-polar disorder and Prison Health Services disregarded Adam's safety when there was a potential serious harm involved (SAMF ¶¶ 188, 189; Willson Dep. at 37- 38), to whit,  PHS  ". . . showed deliberate indifference toward Mr. Dupuis's suicidal potential. . ." (SMF ¶ 40; Resp. SMF ¶ 40; Willson Report.)  Willson defines "deliberate indifference" as disregard for an inmate's safety when there is potential serious harm involved. (SMF ¶ 40; Resp. SMF ¶ 40; Willson Dep. at 38.)  Dr. Willson evaluated Adam's case with the idea of determining if someone was deliberately indifferent to Adam.  (SMF ¶ 44; Resp. SMF ¶ 44; Willson Dep. at  28.)

The defendants counter first and foremost that the description of Adam's treatment as deliberately indifferent is an inadmissible legal conclusion.  (Reply SAMF ¶¶ 188, 189.)  The parties do not dispute that Dr. Willson believes that PHS, Dr. Corona, and the mental health staff were honestly trying to treat Adam; (SMF ¶ 45; Resp. SMF ¶ 45; Willson Dep. at  39-40); that Dr. Willson believes that PHS and Dr. Corona provided some treatment for Adam (SMF ¶ 46; Resp. SMF ¶ 46; Willson Dep. at  39); and that Dr. Willson believes that Dr. Corona was for the most part doing a lot of the right things as far as Adam's medications were concerned.  (SMF

14

¶ 47; Resp. SMF ¶ 47; Willson Dep. at 63-64.)  (See also Reply SAMF ¶¶ 188, 189, citing Corona Aff. ¶¶ 2-21 and Willson Dep. at 39-40, 63-64.)

According to Dr. Willson, Corona was more or less on the right track as far as the medications he was prescribing, although she would not have handled the Xanax the same way. (SMF ¶ 50; Resp. SMF ¶ 50; Willson Dep. at 65; Reply SAMF ¶¶ 188, 189.)   Dr. Willson questions Dr. Corona's decision to taper Adam off Xanax, "the only medication used at that time for Mr. Dupuis that seem [sic]to quiet the mind."  It is the "standard of care" to use a benzodiazepine for irritation associated with bipolar disorder. (SMF ¶ 43; Resp. SMF ¶ 43; Willson Report.)  Probably 50 percent of doctors would not have used Xanax in this situation, and Dr. Willson believes that Dr. Corona had good reasons for not wanting to prescribe Xanax for Adam Dupuis.  (SMF ¶ 51; Resp. SMF ¶ 51; Willson Dep. at 75-76.)  Dr. Willson believes that Xanax is an important medication for treating bipolar disorder, but other doctors could legitimately believe that it is an addictive substance that should not be prescribed to somebody with a long history of substance abuse who is about to get out of prison. (SMF ¶ 52; Resp. SMF ¶ 52; Willson Dep. at 86-87.)  When someone has a substance abuse problem, Xanax and other benzodiazepines must be used carefully because they are addictive substances; Dr. Wilson does and does not use benzodiazepines in treating her patients. (SMF ¶ 48; Resp. SMF ¶ 48; Willson Dep. at 54.)  In Dr. Willson's experience, benzodiazepines can also be used as contraband in a prison setting. (SMF ¶ 49; Resp. SMF ¶ 49; Willson Dep. at 60.)

Relying on Dr. Willson's deposition, Dupuis asserts that Adam suffered from bi-polar disorder, panic disorder, and alcohol dependency.  (SAMF ¶ 193; Willson Dep. at 29.)  The defendants admit that Adam suffered from anxiety ("not otherwise specified"), a diagnosis which includes panic disorder and that Adam  had suffered from alcohol dependency at times in his life.

(Reply SAMF ¶ 193.)  To the extent that this is intended or construed to state that Adam suffered from or was diagnosed with active alcohol dependency during the five months prior to his death during which Dr. Corona participated in his care or that he suffered from bi-polar disorder, the defendants deny this statement. (Id.; Corona Aff. ¶9.)

Dupuis argues, through Dr. Willson, that Paxil is used for panic and anxiety but it will exacerbate a bi-polar disorder.  (SAMF ¶ 194; Willson Dep. at 32.)  The defendants admit that Paxil is used to treat panic and anxiety but argue that, if this statement/assertion is intended or construed as an opinion or statement that Paxil always exacerbates a bi-polar disorder, or that it did so in the case of Adam, Adam was not diagnosed with bi-polar disorder during the five months preceding his death during which Dr. Corona participated in his care.  (Resp. SAMF ¶ 194;  Corona Aff. ¶9.) They point out that Dr. Willson never met, examined or evaluated Adam at any time during his life so this is sheer speculation and conjecture rather than fact.  (Reply SAMF ¶ 194; Willson Dep. at 26.)[11]

According to Dupuis, Prison Health Services treated Adam Dupuis as though he was simply an addict just wanting substances, thereby disregarding his depression, rages and suicidal thoughts.  (SAMF ¶ 190; Willson Dep. at 38.)  The Defendants respond that, even according to Dupuis's own expert, when someone has a substance abuse problem, Xanax and other benzodiazepines must be used carefully because they are addictive substances (Reply SAMF ¶ 190;  Corona Aff. ¶¶ 1 -21;  Willson Dep. at 54), and in Dr. Willson's experience,

---

[11]     Additionally, Dupuis asserts that, according to Dr. Willson, Paxil causes extreme agitation and possible mania which would increase the possibility of suicide. (SAMF ¶ 195; Willson Dep. at 52.)  I agree with the defendants that the citation to this particular passage of the Willson deposition is not sufficient to make this statement 'admissible' for summary judgment purposes.  (See Reply SAMF ¶ 195.) Dupuis further asserts that Dr. Willson believes that Dr. Corona and Prison Health Services failed to monitor Adam closely enough given his high risk for suicide.  (SAMF ¶ 196; Willson Dep. at 64.)   Again, I agree with the defendants that the deposition testimony of Dr. Willson on this score is not sufficient to warrant crediting this opinion.  (See Reply SAMF ¶ 196.)

benzodiazepines can also be used as contraband in a prison setting (Reply SAMF ¶ 190; Willson Dep. at 60).

The parties do not dispute that, in Dr. Willson's opinion, although Dr. Corona noted that Adam Dupuis had chronic thoughts of killing himself, Dr. Corona failed to inquire into the possible sources.  (SMF ¶ 41; Resp. SMF ¶ 41; Willson Report; SAMF ¶¶ 191.)   In Dr. Willson's opinion, neither Dr. Corona nor PHS properly assessed Adam's risk for suicide despite the obvious risk for suicide evidenced by Adam.  (SMF ¶ 42; Resp. SMF ¶ 42; Willson Report.)  If Dr. Corona had performed a proper assessment, Dr. Willson thinks he would have seen Adam Dupuis a lot more frequently.  (SMF ¶ 54; Resp. SMF ¶ 54; Willson Dep. at  23-64.)  Dupuis insists that, if Dr. Corona had inquired appropriately, Adam would have had a much better chance of surviving his stay in the Mental Health Unit of the Maine State Prison.  (SAMF ¶ 192; Willson Dep. at 46, 51.)[12]  Dupuis opines that if Dr. Corona had conducted the proper inquiry regarding Adam's suicidal thoughts, it would have altered his mental judgment in this case.  (SAMF ¶ 197; Willson Dep. at 73-74.)  The defendants respond by pointing out that Willson stated in the deposition: "I'm not saying that it [further inquiry] would have" changed Dr. Corona's medical judgment, (Reply SAMF ¶ 197; Willson Dep. at 75), and, so, Dr. Willson did not know what the ultimate result would have been, had further inquiry been conducted. (Reply SAMF ¶ 197).  The defendants also point out that Dr. Willson cannot testify as to what Dr. Corona's state of mind might have been under a set of hypothetical circumstances.  (Id.)[13]

---

[12]      The defendants deny the first and last statements of this paragraph of facts,  citing to the entire Corona Affidavit and pointing out that these are conclusions of law rather than opinions of fact. (Reply SAMF ¶¶ 191, 192; Corona Aff. ¶¶ 1 - 21.)

[13]      According to Dr. Willson, had Dr. Corona continued to prescribe Xanax to Adam, Adam's risk of suicide would have been reduced by approximately thirty-percent.  (SAMF ¶ 198; Willson Dep. at 91.)  I agree with the defendants that this opinion would not be admissible based on Willson's deposition testimony alone.  (See Reply SAMF ¶ 198; Willson Dep. at 92.)

There is no dispute that Dr. Willson does not know what level of surveillance Adam Dupuis was on at the time of his death, so she cannot comment on whether the level of surveillance was appropriate.  (SMF ¶ 53; Resp. SMF ¶ 53; Willson Dep. at  88.)   Dr. Willson does not know what Dr. Corona's schedule at the prison was like at the time, how frequent1y he was there, or what the population of the MHU was at the time. (SMF ¶ 55; Resp. SMF ¶ 55; Willson Dep. at  42.)

### *Attorney Smith's involvement[14]*

In the fall of 2001, in conjunction with the Maine Civil Liberties Union, the Maine Equal Justice Partners - through Rebekah Smith, Esq. - undertook the representation of prisoners after the MCLU had received a variety of complaints from prisoners regarding mental health treatment.  (SAMF ¶ 162; Reply SAMF ¶ 162.)  Smith began representing Adam in December of 2001. (SAMF ¶ 163; Reply SAMF ¶ 163.)  Smith's chief contact person in discussing mental health management of prisoners was Joseph Fitzpatrick of the Department of Corrections. (SAMF ¶ 164; Reply SAMF ¶ 164.)  According to Smith, Adam Dupuis's complaint was the medications he was being prescribed and the treatment that he was given was not sufficient to control his anxiety and his bi-polar disorder.  ( SAMF ¶ 166.)[15]  Smith discussed this explicitly with Fitzpatrick. (SAMF ¶ 167; Reply SAMF ¶ 167.)[16]

---

[14]     Out of an abundance of caution, I have included some facts in the recitation below that may at the most be marginally material to Dupuis's claims against Corona and PHS.

[15]     The defendants concede this paragraph for summary judgment purposes but argue that this statement is admissible hearsay.  (Reply SAMF ¶ 166.)  I have considered it as admissible under Federal Rule of Evidence 807, for purposes of summary judgment only.

[16]     Dupuis asserts that in February of 2002, Adam's father, Raymond Dupuis, called Smith and told her that Adam had attempted suicide two times.  Smith then called the Maine State Prison in Warren where Adam was housed several times and left a message for Adam.  (SAMF ¶ 168.)  He cites to page 15, lines 6 through 20, of Smith's deposition which, as the defendants point out, does not support this assertion.  Inexplicably, both parties have been stingy with the court in terms of providing it with the Smith deposition transcripts each side selecting only a handful of disjointed pages.

According to Dupuis, Smith knew that Adam felt very strongly - and the overt signs were very clear - that the medications chosen by Dr. Corona to replace Xanax were not working adequately.  (SAMF ¶ 171; Smith Dep at 31.)[17]  The defendants respond that the source of Smith's "knowledge" or direct observation regarding Adam Dupuis was a "passing observation" that he "appeared very low in spirits."  (Reply SAMF ¶ 171; Smith Dep. at  16, 31- 32.)  Smith met Adam Dupuis just once, in December, 2001 – on a date which is not established to have occurred prior to December 16, 2001, when Dr. Corona first ordered the tapering of Xanax.  (Reply SAMF ¶ 171; Corona Aff. ¶9;  Smith Aff. ¶¶1,2.)  Thus, her "observations" of him at their only meeting could not have resulted from the upcoming Xanax taper.  (Reply SAMF ¶ 171; Smith Dep. at 16, 32.)  They also question the competency of Smith to draw these conclusions given her lack of medical training.  (Reply SAMF ¶ 171.)

 According to Smith, Adam simply expected to be provided mental health treatment that would return him to the level of functions that he had previously experienced in prison. (SAMF ¶ 172; Smith Dep. at 32.)  This level of function was simply a level where Adam was able to attend chow hall and go outside and do recreation where he wasn't overwhelmed by anxiety. (SAMF ¶ 173; Smith Dep. at 32.)[18]

On January 3, 2002, Adam wrote Smith a letter stating that Dr. Corona had decided a week or two previously to wean him off his anti-anxiety medication, Xanax.  (SAMF ¶ 177; Smith Aff. ¶ 2.)   On January 11, 2002, Adam wrote to Smith stating that Dr. Corona was still refusing to help him with Xanax.  Adam told Dr. Corona that if he went off this medication he

---

[17]     I agree with the defendants that the representations in Paragraphs 169 and 170 are inadmissible hearsay. (Reply SAMF ¶¶169, 170.)

[18]     The defendants object to Paragraphs 172 and 173 on hearsay grounds.  (Reply SAMF ¶¶ 172, 173.) In my opinion for purposes of ruling on this motion for summary judgment the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule. I agree with them on their objection the contents of Paragraphs 174, 175, and 176.  (Reply SAMF ¶¶ 174, 175, 176.)

would get into trouble and do more time. Dr. Corona responded that he would just have to do more time then.  (SAMF ¶ 178; Smith Aff.  ¶ 3.)[19]

On January 18, 2002, Smith e-mailed Fitzpatrick indicating that Dr. Corona had discontinued Adam's Xanax.  Smith asked Fitzpatrick about current prescriptions and a treatment plan.  (SAMF ¶ 179; Smith Aff. ¶ 4.)  On January 24, 2002, Fitzpatrick responded to Smith indicating that he would look into it.  On January 24, 2002, Fitzpatrick informed Smith that Adam had a significant history of drug abuse and they wanted to wean him off Xanax and try something different, even though Adam was complaining that he needed Xanax. (SAMF ¶ 180; Smith Aff. ¶ 5.)  Fitzpatrick indicated that Adam was on a hunger strike in protest to the medication change.  (SAMF ¶ 181; Smith Aff. ¶ 6; Reply SAMF ¶ 181.)

On February 11, 2002, Raymond Dupuis faxed Smith a letter indicating that Adam was now completely off Xanax and was not feeling good. Adam was taking Paxil and Nortriptyline which were not helping his anxiety.  Now he was not going to recreation or chow hall because the anxiety was so overwhelming.  He felt he was a totally different person and he couldn't be around people.  He asked that Smith get a second opinion about the medication or call his father. (SAMF ¶ 181; Smith Aff. ¶ 6.)[20]

On February 11, 2002, Smith called Fitzpatrick and left a message, called Carol Carruthers a mental health professional, and called Mary Lou Finneran, another health care professional to determine whether or not the medication substitution was appropriate. (SAMF

---

[19]      The defendants object that Paragraphs 177 and 178 are inadmissible on hearsay grounds.  (Reply SAMF ¶¶ 177, 178.)  For purposes of ruling on this motion for summary judgment the statements are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.
[20]      The defendants assert that the statements of Raymond Dupuis to Smith as to what Adam Dupuis told Raymond Dupuis are inadmissible hearsay.  (Reply SAMF ¶ 181.)  I am troubled by the fact that Raymond Dupuis has not filed his own affidavit, thereby eliminating the double hearsay aspect of this evidentiary question.  However, this is something that could presumably be remedied at a trial and I include the statements here.

¶ 182; Reply SAMF ¶ 182.)  On February 21, 2002, Smith left a message for Fitzpatrick again.

Fitzpatrick indicated that Adam was fixated on getting his benzodiazepines and was frustrated

with the alternative antidepressants. (SAMF ¶ 183; Reply SAMF ¶ 183.)   Fitzpatrick said that

none of the medical staff had seen any symptoms of anxiety attacks. On February 27, 2002,

Smith met with prisoners at the Maine State Prison. Smith's work partner, Brian Wallace, of the

MCLU, met with Adam and indicated that Adam felt as though there was nothing that could be

done for him at that point. (SAMF ¶ 184; Reply SAMF ¶ 184.)

### Adam's letters to his dad[21]

On Monday, February 11, 2002, Adam wrote to his father:

> I talked to Dr. Zoobrot [sic] and he told me I couldn't get a Dr. from the streets to
> see me. I think he might be lying to me but this is what it comes down to. I tried
> Dr. Corona's alternative medications, and I also do the meditation he told me to
> do, but I am still having problems. Since he first started decreasing my medication
> a month and a half ago I tried hanging myself, then again two weeks ago. That is
> not good, and if anything happens to me this place is in deep shit. I'm not trying
> to scare you I just want you to know what the medical Dept is doing to me. I'm
> gonna give them two week's [sic] to put me back on my xanax or I'll have to do
> something. I just can't take it I need help. I was fine before they took my
> medicine from me. I don't know what to do. Can you get your Lawyer to call Dr.
> Zoobrought [sic] and tell him if anything happens to me you are responsible. I
> think that will change their minds. I have done everything I can do in here.  All I
> get is lyes [sic] I'll let you go dad. I love you. Adam.

(SAMF ¶ 199; Docket No. 118-4 at 1-2.)

Adam sent another letter to his father dated April 29, 2002, which states in part:

> Hi how are you?  I'm doing better.  I just got out of 23 hr lockdown for 3 days.  I
> went there my choice. I've been stressing out a lot lately. All the staff are lying to
> me. And they all think I'm a drug addict trying to scam drugs from other inmates

---

[21]        The plaintiffs object to all three of these paragraphs setting forth the letters Adam sent to his dad shortly
before his suicide on the grounds that they are inadmissible hearsay statements.  While Dupuis might have taken
more care in establishing the letters' authenticity, there is little question that they are in Adam's handwriting; Dupuis
has included a copy of an envelope mailed from the prison to Raymond Dupuis which is post-marked February 13,
2002.  (Docket No. 118-4 at 5.) In my opinion for purposes of ruling on this motion for summary judgment the
letters are admissible under Federal Rule of Evidence 807's residual exception to the hearsay rule.

and the doctor. I almost snapped on them Friday. I'm trying my best Dad but I
don't know if I'll be able to make it. Maby [sic] you can call here and talk to
Heartwell [sic] or Dr. Zoobrout [sic]. I was so wound up Friday I almost smashed
my tv and started cutting up with the glass. I'm doing a little better now but it's
just a matter of time before it happens again.

(SAMF ¶ 200; Docket No. 118-4 at 3.)

The final letter from Adam, written May 6, 2002, contains the following passage:

I told you people over and over again that I am going to snap, I just can't
take this pressure any more. That's why it is time for me to go. This world is too
stressful! for me you can't won't help me because you think I am out to scam
drug's, well after you find me hanging you might feel different about other
people.
Please Lord forgive me for all my sins, I believe in you so hopefully I'll be
seeing you.  I am not a bad person.  Just made some bad choices.

(SAMF ¶ 201; Docket No. 118-4 at 4.)

### *Liability of Dr. Corona*

To justify sending the question of Dr. Corona's liability under the Eighth Amendment
deliberate indifference standard to the jury, Dupuis must create a genuine dispute of fact that
Corona was both aware "of facts from which the inference could be drawn that a substantial risk
of serious harm exists," and that he also drew that inference.  Farmer, 511 U.S. at 837; see also
Scott, 127 S. Ct. at 1776.   Under the First Circuit's tailored test there must be a genuine dispute
that there was an unusually serious risk of suicide, Dr. Corona had "actual knowledge of (or, at
least, willful blindness to) that elevated risk," and he failed "to take obvious steps to address that
known, serious risk."  Manarite, 957 F.2d at 956.

I have considered all the disputed and undisputed evidence set forth above and conclude
that Dr. Corona is entitled to summary judgment.  The most material, credible evidence with
respect to Dr. Corona from the facts set forth above is as follows.  Dr. Corona first assessed
Adam on December 13, 2001, at which juncture his was on 8 mg of Xanax a day.  Despite his

22

medication, Adam reported frequent panic attacks, reported thoughts of killing himself when he

was released from prison but did not report a specific plan or intention to do this, he was

coherent and engaged without any signs of psychosis and denied auditory hallucinations, and he

had a history of drug and alcohol abuse.  Dr. Corona diagnosed anxiety and depression.  Based

on his assessment, Dr. Corona determined that Xanax was not an appropriate medication and

doctor and patient discussed other possible medical treatment, but Adam was unwilling to try

any other treatment at the time. Dr. Corona decided to taper Adam off Xanax.

     Dr. Corona did not participate in any decisions regarding which subunit Adam was

assigned to.  The treatment team decided what inmates to schedule to see Dr. Corona on his days

at the prison and provided information to him as to what problems or complaints an inmate had

that required the doctor's attention.

- On December 27, 2001, Dr. Corona saw Adam again.  Adam indicated he was uncomfortable discontinuing Xanax and Dr. Corona prescribed Remeron to treat depression and anxiety.
- On January 8, 2002, Adam still complained about tapering off Xanax and stated that the Remeron was not helping him. Adam requested that Dr. Corona prescribe Paxil, an anti-depressant medication also used to treat panic disorder, and the doctor agreed to do so.
- On January 11, 2002, Adam Dupuis wrote to Smith stating that Dr. Corona was still refusing to help him with Xanax.  Adam indicated to Smith that he had told Dr. Corona that if he went off this medication he would get into trouble and do more time and Dr. Corona responded that he would just have to do more time then.
- On January 23, 2002, Adam proposed that Dr. Corona prescribe Imipramine, a tricyclic antidepressant. The doctor declined to do this out of concern for possible side effects.  Instead, the doctor decided to try Nortriptyline, a different tricyclic anti-depressant which can often complement the effect of the Paxil Adam was taking.
- On January 30, 2002, Adam reported that he was sleeping better with the Nortriptyline and that his anxiety was better with the Paxil. He appeared more cooperative and compliant with his medication and his mood was good.  Dr. Corona decided to increase the dose of Nortriptyline to improve the effect and he noted that staff should watch for interactions between the two medications.

- On February 12, 2002, Adam complained that the Paxil was not effective, so Dr. Corona increased his dose of Paxil at that time.  Adam appeared alert and oriented without runaway thoughts or flight of ideas.
- On February 21, 2002, Fitzpatrick indicated to Attorney Smith that Adam was fixated on getting his benzodiazepines and was frustrated with the alternative antidepressants.  Fitzpatrick said that none of the medical staff had seen any symptoms of anxiety attacks
- By February 26, 2002, the Xanax taper had been completed, and Adam was upset that he was no longer receiving Xanax. He claimed to have attempted to commit suicide twice, but members of the treatment team told the doctor that this had not occurred and no incident was documented in Adam's records.  On that occasion, Adam told Sr. Corona that he felt like attempting suicide.   Dr. Corona believed that Adam was attempting to manipulate him into prescribing the medicine he wanted and he told Adam so. Adam became upset and started using foul language and eventually left the session.
- On March 21, 2002, Adam advised the doctor that he was improving with Paxil but complained of mood instability and insomnia.  Adam requested a prescription of Trazadone, an anti-depressant and Dr. Corona agreed to try him on that medication.
- On April 4, 2002, Adam reported to Dr. Corona that he was having trouble coping with his impending release from prison. Adam reported some continuing anxiety but felt that the Paxil was helping. He requested an additional medication and Dr. Corona prescribed an anti-convulsant which also augments other medications used to treat anxiety and depression.
- On April 18, 2002, Dr. Corona ordered a blood toxicology screen on Adam, purportedly because a team member expressed the suspicion that Adam had illicitly obtained some Elavil.  There is a dispute as to where the suspicion of the elicit obtaining of Elavil came from and there is Dr. Zubrod's speculation that it would have been extremely upsetting to Adam Dupuis if he was to know that his own clinicians were taking blood in order to perform toxicology screening without Adam's permission.
- On May 2, 2002, Dr. Corona met for the last time with Adam.  At that time, Adam complained of decreased concentration, restlessness, and vague suicidal thoughts.  He did not appear to be in distress but rather was reading his symptoms from a piece of paper he had with him. He continued to request Xanax. He told Dr. Corona that he had tried to choke himself with a plastic bag, but the treatment team member present said this had not occurred. Dr. Corona asked Adam if he was really going to do something, and Adam said no. He requested an additional medication and Dr. Corona agreed to prescribe it.

There is no dispute that Dr. Corona believed that the threat of suicide some months

before Adam's death was an attempt to manipulate the doctor into prescribing Adam's drug of

choice.  There is not sufficient evidence in this record to draw an inference that Corona ordered

24

the blood tests with the subjective knowledge that it might aggravate Adam's mental condition.
See Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (observing that
a plaintiff cannot defeat summary judgment by relying on "conclusory allegations, or rank
speculation," quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

With respect to Dr. Willson's proposed expert testimony, in her deposition testimony Dr
Willson testified to a belief that Dr. Corona was for the most part doing a lot of the right things
as far as Adam's medications were concerned.  According to Dr. Willson, Dr. Corona was more
or less on the right track as far as the medications he was prescribing, although she would not
have handled the Xanax the same way.  Probably 50 percent of doctors would not have used
Xanax in this situation, and Dr. Willson believes that Dr. Corona had good reasons for not
wanting to prescribe Xanax for Adam.  Dr. Willson believes that Xanax is an important
medication for treating bipolar disorder and that Paxil is used for panic and anxiety but it will
exacerbate a bi-polar disorder.  Adam was not diagnosed with bi-polar disorder during the five
months preceding his death, the time period in which Corona participated in his care.  Dr.
Willson never evaluated Adam so has no basis for diagnosing a bi-polar condition.

Dupuis insists that Dr. Corona's beliefs about Adam's condition and motivations were not
reasonable but the  Farmer/Manarite deliberate indifference inquiry is a subjective test and
Dupuis has admitted the key statements of facts vis-à-vis Dr. Corona's state of mind.  Most
importantly, Dupuis admits that Dr. Corona was very surprised when he learned that Adam killed
himself; that Dr. Corona believed that the medication he had prescribed for Adam, particularly
the Paxil, was helping to control his anxiety and depression; that Dr. Corona was aware that over
the years of his incarceration, Adam had exhibited some risk for suicide, but he did not believe
that Adam was at an acute risk for suicide during the months that the doctor treated him; that Dr.

Corona believed that the threat of suicide some months before Adam's death was an attempt to manipulate the doctor into prescribing Adam's drug of choice; and that the treatment team did not tell Dr. Corona that they felt Adam was an imminent threat to commit suicide, and Dr. Corona believed that Adam's care was being appropriately managed by the MHU staff.   Dr. Willson's testimony about what would have been Dr Corona's state of mind had he conducted further inquiry into Adam's potential for suicide is not evidence that I can credit.   From Adam's letters to his dad there is evidence that Adam was indeed experiencing a marked decline.   There is no evidence that Dr. Corona saw the letters.

As the opponent of this motion for summary judgment, Dupuis must do more than simply show that there is some metaphysical doubt as to the material facts.  Scott, 127 S. Ct. at 1776. Taking this record as a whole as it pertains to Dr. Corona it could not lead a rational trier of fact to find for Dupuis and there is no genuine issue for trial.  Id.  This is a case where there is a palpable and painful factual dispute between the parties but, when the facts are ciphered through the pleading standards of federal and local Rule 56 and, then, viewed through the prism of the Eighth Amendment deliberate indifference standard, Dupuis has not defeated Corona's case for summary judgment, because there is "no genuine issue of material fact.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)).

### Liability of Prison Health Services Inc.

In his memorandum responding to this motion for summary judgment as it relates to Prison Health Services, Inc.,  Dupuis argues that "PHS is a for profit, out of state corporation, that was paid over twelve million dollars to care for our incarcerated population.  PHS makes no argument to the effect that it should be treated as a governmental entity.  Based upon the insufficiency of its argument alone, PHS's motion must be denied." (Opp'n Mem. at 17.)  The

problem with this line of attack is that the only way that Dupuis can recover against PHS on his 42 U.S.C. § 1983 deliberate indifference claims is if PHS was functioning as a state actor.  See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); compare Holly v. Scott, 434 F.3d 287, 291 -92 (4th Cir. 2006) (declining to extend the 42 U.S.C. § 1983 state actor doctrine to a Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), action against employees of a private correctional facility vis-à-vis claims of inadequate medical care).

If the Court agrees with my recommendation that Dr. Corona is entitled to summary judgment on Dupuis's claims against him, PHS is also entitled to judgment because it cannot be held liable unless Dupuis can establish that one of its employees violated his Eighth Amendment rights.  See Wilson v. Town of Mendon, 294 F.3d 1, 6 -7(1st Cir. 2002); see also Bowman v. Corrections Corp. of America, 350 F.3d 537, 544-47 (6th Cir. 2003).

Putting aside the above two problems for Dupuis, with regards to the merits of Dupuis's claim against PHS, PHS invites the court to assume "*arguendo*, that PHS qualifies as a governmental entity for purposes of applying § 1983."  (Mot. Summ. J. at 18.)  See Woodward v. Corr. Med. Servs. Ill., Inc., 368 F.3d 917, 927 n. 1 (7th Cir. 2004); Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 -85 (3d Cir. 2003).  The Seventh Circuit's Woodward analyzed the corporation/defendant's Eighth Amendment liability for the suicide of an inmate by viewing the corporation as acting under state law as a municipality.  368 F.3d at 927 & n.1.  Thus, as PHS acknowledges (Mot. Dismiss at 17-18), the court must examine the record as it pertains to PHS

under the <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658 (1978) standard for assessing

municipal "policy or custom" liability.[22]

"[I]n <u>Monell</u> and subsequent cases," the United States Supreme Court has "required a

plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal

'policy' or 'custom' that caused the plaintiff's injury." <u>Board of County Comm'rs of Bryan</u>

<u>County v. Brown</u> 520 U.S. 397, 403 (1997) (citing <u>Monell</u>, 436 U.S. at 694, <u>Pembaur v.</u>

<u>Cincinnati</u>, 475 U.S. 469, 480-81 (1986), and <u>Canton v. Harris</u>, 489 U.S. 378, 389 (1989)).

PHS must "demonstrate that, through its <u>deliberate</u> conduct," PHS "was the 'moving force'

behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with

the requisite degree of culpability and must demonstrate a direct causal link between the

municipal action and the deprivation of federal rights." <u>Board of County Comm'rs of Bryan</u>

<u>County</u>, 520 U.S. at 404.

Dupuis has not attempted to establish that PHS has a formal policy that led to Adam's

suicide; there is no record of what the PHS policies were apropos the assessment and treatment

of inmates with mental health problems. The only possible evidence going to this showing is

generated by the defendants. At that time, PHS maintained a formulary, an approved list of

medications that its physicians were allowed to prescribe. Dr. Corona was required to obtain

approval of the medical director to prescribe medications not in the formulary. However,

requests for prescriptions outside the formulary were routinely approved. Both Remeron and

Paxil (which the doctor later prescribed for Adam) were outside the formulary, but Dr. Corona

had no problem obtaining approval to prescribe them. In terms of PHS's staffing policy, Dr.

---

[22]        PHS also touches upon supervisory liability in its memorandum but that theory of recovery would only
pertain if Dupuis sued a defendant employed by PHS and who had some sort of supervisory liability connected to
the alleged harm. <u>See</u> <u>Martinez-Velez v. Rey-Hernandez</u>, 506 F.3d 32, 41 (1st Cir. 2007).

Corona was usually present at the prison two days a week. He relied on information given to him by members of the treatment team when making decisions regarding inmates' medication.  He was not usually consulted in determining on which subunit an inmate should be housed. He felt it preferable to leave these decisions to the treatment team, since they had daily contact with the inmates.  Compare Woodward, 368 F.3d at 920-22 (setting forth in detail the preliminary screening and assessment services promised by a private correctional health-care provider, describing the contract representations, written manual, the intake screening form, the instructional video, and the notification procedures if a suicide risk was identified).

PHS's "municipal liability can also be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.'" Woodward, 368 F.3d  at 927 (quoting Estate of Mavack v. County of Wood, 226 F.3d 525, 531 (7th Cir. 2000), quoting Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir.1995)).

The facts in the record that possibly go to this type of showing are as follows. In the fall of 2001 the MCLU had received a variety of complaints from prisoners regarding mental health treatment.  Smith discussed Adam's condition with Fitzpatrick but there is no evidence that the Department of Corrections engaged with PHS on this score.  On January 18, 2002, Smith e-mailed Fitzpatrick indicating that Dr. Corona had discontinued Adam's Xanax.  Smith asked Fitzpatrick about current prescriptions and a treatment plan.  On January 24, 2002, Fitzpatrick responded to Smith indicating that he would look into it. On January 4, 2002, Fitzpatrick informed Smith that Adam had a significant history of drug abuse and they wanted to wean him off Xanax and try something different, even though Adam was complaining that he needed

29

Xanax.   Even if it were possible to infer that Dr. Corona was made aware of the inquiries made

by Smith and even if this knowledge was imputed to PHS, these facts do not create a genuine

dispute of facts justifying sending the question of PHS's "actual practice (as opposed to its

written policy) towards the treatment of its mentally ill inmates was so inadequate that [PHS]

was on notice at the time [Adam] was incarcerated that there was a substantial risk that he would

be deprived of necessary care in violation of his Eighth Amendment rights." Woodward, 368

F.3d at 927.  Compare id. at 922-26, 927-98; Natale, 318 F.3d at 583 -85.

### Conclusion

For the reasons set forth above, I recommend that the court grant Dr. Corona's and Prison

Health Services Inc.'s motion for summary judgment (Docket No. 104.)


### NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought,
together with a supporting memorandum, within ten (10) days of being served
with a copy thereof.  A responsive NOTICE memorandum shall be filed within
ten (10) days after the filing of the objection.
Failure to file a timely objection shall constitute a waiver of the right to de
novo review by the district court and to appeal the district court's order.


March 7, 2008.                        /s/Margaret J. Kravchuk
                                      U.S. Magistrate Judge